UNITED STATES of America,
Plaintiff–Appellee,

v.

William BROWN, Danny Brown, Scot Burkhead, Randall Sorrells, and Brian Hollenback, Defendants–Appellants.

Nos. 90–2382, 90–2414, 90–2478, 90–2752 and 90–3179.

United States Court of Appeals,
Seventh Circuit.

Argued May 13, 1991.

Decided Sept. 30, 1991.

Rehearing Denied Nov. 22, 1991.

Bradley W. Murphy, Asst. U.S. Atty., Peoria, Ill., William M. Welch, Dept. of Justice, Tax Div., Washington, D.C., Rodger A. Heaton, Asst. U.S. Atty. (argued), Springfield, Ill., for U.S.

F. Jack Nathan (argued), Spector, Tappa & Nathan, Rock Island, Ill., for William C. Brown.

William G. Schick (argued), Rock Island, Ill., for Danny Brown.

Richard H. Parsons (argued), Peoria, Ill., for Scot Burkhead.

Walter D. Braud (argued), Mike Wassell, Duane Thompson, Braud & Warner, Rock Island, Ill., for Randall Sorrells.

Robert L. Ellison (argued), Klockau, McCarthy, Ellison & Marquis, Rock Island, Ill., for Brian Hollenback.

Before POSNER, FLAUM and EASTERBROOK, Circuit Judges.

FLAUM, Circuit Judge.

"Operation Adobe," an undercover investigation into marijuana distribution in the Quad Cities area of Illinois and Iowa, resulted in the October 1989 indictments of eleven individuals, including the appellants in this case. The indictment alleged that these individuals conspired together to distribute marijuana, laundered drug proceeds, and failed to pay federal income taxes. Three challenge the district court's application of the Sentencing Guidelines to their cases, and two contend that the evidence was insufficient to support their convictions. We affirm the convictions but vacate the sentences and remand for resentencing.

## I.

Michael Cutkomp was the leader of a marijuana distribution ring that operated in the Rock Island, Illinois area between 1982 and 1988. Cutkomp created the organization, recruiting accomplices and directing their activities. He purchased marijuana in Arizona and shipped it to Illinois in the care of a number of couriers, including his mother and mother-in-law. Once a shipment arrived in Illinois, Cutkomp arranged for it to be broken down into smaller portions and parcelled out to his primary distributors, who included Danny Brown and Scot Burkhead. This group would in turn pass the marijuana on to a second tier of distributors, including William Brown (Danny Brown's half-brother) and Randall Sorrells. These distributors would sell either directly to users or to still other distributors. Brian Hollenback, a friend of the Brown brothers, became involved in the scheme when he laundered proceeds of the drug sales through a mortgage company where he worked. Hollenback also smoked marijuana and was supplied on occasion by Danny Brown.

Cutkomp lived in the Rock Island area until 1985, when he moved to Arizona. There he continued to obtain marijuana and to ship it to the Quad Cities area. Danny Brown and Scot Burkhead coordinated the shipments; when the marijuana reached Illinois, it was often broken down in storage lockers rented in Danny Brown's name. At other times, the shipments were processed at one of the other defendants' homes. The evidence at trial suggested that the group distributed more than five thousand kilograms of marijuana in the Quad Cities area and generated over $4.25 million in revenue. When Cutkomp got wind of "Operation Adobe," he and his wife fled. So far as the record reflects, they remain at large.

## II.

Cutkomp's co-conspirators were less adroit; they were arrested and convicted. Three of them, William Brown, Danny Brown, and Scot Burkhead, challenge the sentences the district court gave them under the Sentencing Guidelines. Our standard of review is deferential. "A trial court's sentence under the Federal Sentencing Guidelines will be upheld so long as the Guidelines were correctly applied to findings of fact that were not clearly erroneous." *United States v. Vopravil*, 891 F.2d 155, 157 (7th Cir.1989); *see also* 18 U.S.C. § 3742(d). In making its sentencing determination, "[t]he district court must draw inferences from a variety of data, including the defendant's demeanor and information in the [presentence report], in order to reach [its] conclusion." *United States v. Hernandez*, 931 F.2d 16, 17 (7th Cir.1991) (per curiam). We defer to the district court's factual findings and credibility determinations unless they are without support in the record; we do not decide factual issues *de novo*. "A finding of fact is clear-

ly erroneous only if, after reviewing the entire evidence, we are left 'with the definite and firm conviction that a mistake has been committed.'" *United States v. Herrera,* 878 F.2d 997, 1000 (7th Cir.1989) (quoting *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)).

## A. William Brown

■ After being indicted for conspiracy to distribute marijuana, William pled guilty and was sentenced to 72 months incarceration. The district court increased William's base offense under § 3B1.1(c) of the Sentencing Guidelines, which provides for a two-level enhancement "[i]f the Defendant was an organizer, leader, manager or supervisor in any criminal activity." William objected to the enhancement at his sentencing hearing, but the judge rejected his arguments and increased his base offense level from 26 to 28. In view of the lack of any evidence suggesting that William was a manager or supervisor of others in the conspiracy, we believe his case should be remanded for resentencing.

The Guidelines provide enhancements for offenders who play an "Aggravating Role" in their offenses. Under § 3B1.1, a defendant's base offense level may be enhanced by as much as four levels if evidence shows the following:

(a) If the defendant was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

(b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

(c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

U.S.S.G. § 3B1.1. As we observed in *Herrera, supra,* § 3B1.1 was " 'included primarily because of concerns about relative responsibility' " and provides " 'a range of adjustments to increase the offense level based upon the size of the criminal organization (*i.e.,* the number of participants) and the degree to which the defendant was responsible for committing the offense.' " 878 F.2d at 999 (quoting U.S.S.G. § 3B1.1, comment. (backg'd)). The Guidelines do not define the terms "leader," "organizer," "manager," or "supervisor," but the commentary to § 3B1.1 suggests that the following factors be considered in deciding whether to enhance a defendant's offense level:

[T]he exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, comment. (n. 3).[1]

The government relied on two pieces of evidence to support its argument that William was a supervisor in the conspiracy. First, it pointed to evidence showing that William had distributed marijuana to customers who both kept the drugs for personal use and resold them to others (*i.e.,* that he was a middleman or distributor). Second, William's home was used as a site for unloading the truck shipments from Arizona and, on at least one occasion, William allegedly oversaw the unloading of one of the shipments at his home. According to the government, "[t]he fact that he was trusted to supervise the delivery of major shipments of marijuana is strong evidence of his role as a supervisor or manager of the criminal activity." The district court discounted this isolated incident, holding that William's role in unloading the truck

---

**1.** These factors actually were provided to help "distinguish[ ] a leadership and organizational role from one of mere management or supervision." U.S.S.G. § 3B1.1, comment. (n. 3). As we have previously stated, however, the same factors are relevant to determine whether a defendant qualifies as a supervisor at all. *United States v. Ramos,* 932 F.2d 611, 618 n. 14 (7th Cir.1991).

did not justify a § 3B1.1 enhancement. The court instead focused on evidence that William was a distributor in the Cutkomp drug ring, explaining its decision to enhance William's sentence as follows:

I think the best way to characterize [William's] role here is to say that he was a purchaser, that he did sell for profit, that he sold it to some people who primarily just used it for their own use, but he also sold to people who resold. And in that sense, in view of the nature of the distribution scheme, I think it is fair to characterize him as a supervisor.... [I]f the only people he sold to were people that just used it for their own use and did not resell, then I would not allow the upward adjustment.

We believe that the district court applied § 3B1.1 incorrectly in this case. The central concern of § 3B1.1 is relative responsibility. Under the Guidelines, those who play an aggravating role in the offense are to receive sentences that reflect their greater contributions to the illegal scheme. William's status as a distributor, standing alone, does not warrant an enhancement under § 3B1.1. In a case similar to ours, the First Circuit in *United States v. Fuller*, 897 F.2d 1217 (1st Cir.1990), reversed an enhancement under § 3B1.1 based solely on distributor status. Then–Chief Judge Campbell, writing for the court, reasoned that

section 3B1.1 does not apply to a defendant who merely organizes or supervises criminal activity that is executed without the aid of others. Instead, the defendant must have exercised some control over others involved in the commission of the offense or he must have been responsible for organizing others for the purpose of carrying out the crime. This requirement is implicit in the terms "organizer, leader, manager and supervisor," each of which suggests the presence of underlings or subordinates....

.    .    .    .    .

The evidence indicated that [the defendant] did not rely on the assistance of others, but instead engaged in a number of private drug distributions, in which he essentially did all the work himself.... [T]here was no evidence that [the defendant] exercised any authority over [the undercover agent who purchased drugs from the defendant].... [The agent] acted as an independent buyer, and not as a participant whose activities were directed or organized by [the defendant].

897 F.2d at 1220–21. *See also United States v. Mares–Molina*, 913 F.2d 770, 773 (9th Cir.1990) (reversing § 3B1.1 enhancement for lack of evidence that defendant "exercised control or was otherwise responsible for organizing, supervising, or managing others in the commission of the offense."). By contrast, in *Herrera*, the first case in this Circuit to interpret § 3B1.1, we held that the adjustment was proper where evidence showed that the defendant exercised control over his wife and directed her actions in transporting drugs. 878 F.2d at 1000. The defendant's control over others has been an important and recurring factor in subsequent cases affirming enhancements under § 3B1.1. *See United States v. Ramos*, 932 F.2d 611, 618 (7th Cir.1991) (defendant controlled other members of the drug ring); *United States v. Franco*, 909 F.2d 1042, 1046 (7th Cir.1990) (defendant directed others in drug distribution); *United States v. Camargo*, 908 F.2d 179, 185 (7th Cir.1990) (fact that co-conspirator was unwilling to act without defendant's consent implied defendant exercised control in conspiracy).

Middlemen are not, of course, immune from application of § 3B1.1. *See, e.g., Ramos*, 932 F.2d at 619 n. 20; *United States v. Brown*, 900 F.2d 1098, 1102 (7th Cir.1990). The government might have been on more solid footing in seeking the adjustment had it presented evidence that William played a supervisory role in the marijuana shipments that were unloaded at his home. It did not present that evidence, however, nor did it offer evidence that William claimed the right to a larger cut of the profits, exercised any control over the customers to whom he sold drugs, or recruited dealers to work for him. The government showed that William processed large quantities of marijuana, but we have previously

rejected the notion that the size of a drug deal is determinative of eligibility for an enhancement under § 3B1.1. In *Herrera,* the government argued that the quantity and quality of drugs a conspirator was responsible for distributing could be a controlling factor in determining whether that conspirator was a manager or supervisor. We disagreed, noting that "while we have no doubt that a large quantity of drugs permissibly may be used to infer that a large organization exists, that does not address the defendant's relative role in that large organization—the issue under Guidelines 3B1.1." 878 F.2d at 1001. *See also United States v. Thompson,* 944 F.2d 1331, 1349 (7th Cir.1991). The guidelines make quantity relevant to the determination of a defendant's base offense level, and although they do not proscribe quantity as a factor to be considered under § 3B1.1 as well, *Herrera,* 878 F.2d at 1001 n. 3, we do not think that factor relevant in this case.

In sum, we conclude that middleman status alone cannot support a finding that a defendant was a supervisor, manager or leader of a criminal activity, and thus was more culpable than others for the wrongdoing—the central concern of § 3B1.1. In this case, William Brown's sentence was improperly increased based solely on his status as a distributor and we therefore remand to the district court for resentencing. While we are mindful that "[t]here can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy," U.S.S.G. § 3B1.1, comment. (n. 3), the facts in this case fail to support an enhancement for William Brown.

### B. Danny Brown

■ Danny Brown was indicted on seven counts of marijuana distribution, money laundering, and tax evasion. He eventually pled guilty to one count of conspiracy to distribute marijuana and one count of money laundering. The district court enhanced Danny's sentence by four levels under § 3B1.1(a) for being a leader of criminal activity involving five or more people and by two levels under § 3C1.1 for obstruction of justice.[2] Although the resulting sentencing range was 292–365 months, the court departed downward and sentenced Danny to 180 months incarceration on the ground that Danny had offered the authorities substantial assistance in uncovering further illegal activity. On appeal, Danny challenges the district court's enhancements to his sentence.

As noted earlier, § 3B1.1(a) provides a four-level enhancement for "an organizer or leader" of a group of five or more, while § 3B1.1(b) provides a three-level enhancement for "a manager or supervisor" of such a group. Danny claims that the court erred by giving him a four-level enhancement instead of a three-level enhancement, and we agree. In imposing the enhancement, the district court stated that Danny "was indeed an organizer, leader, manager or supervisor." Sentencing Tr. at 24. To properly enhance a sentence under § 3B1.1, however, the court must distinguish between these classifications, since the enhancement increases as the leadership role increases. The record reveals that Danny Brown was only a manager in a marijuana distribution scheme organized and controlled at all times by Michael Cutkomp. Although Danny Brown became the ranking member of Cutkomp's organization in Illinois after Cutkomp moved to Arizona, the record does not reflect that he assumed any additional responsibilities in Cutkomp's absence. His role remained the same, and we do not believe that he warranted a four-level increase rather than a three-level increase simply because Cutkomp began exercising control from Arizona rather than from Illinois. We therefore vacate this portion of the district court's sentence and remand for resentencing.[3]

---

**2.** The court also gave Danny a two-level reduction under § 3E1.1 for acceptance of responsibility. Danny assisted in the investigation of the drug ring and testified against Sorrells and Hollenback at their trial.

**3.** The district court's decision to depart downward from the applicable guideline range does not render the result of the sentencing remand a foregone conclusion as the court must tie the degree of downward departure to the structure

■ Danny next claims that the court erred by increasing his base offense level by two levels under § 3C1.1 for obstruction of justice. Section 3C1.1 provides a two-level enhancement "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." The Application Note to this section specifically provides that "destroying or concealing evidence ... that is material to an official investigation or judicial proceeding" is an example of behavior meriting an enhancement. U.S.S.G. § 3C1.1, comment. (n. 3(d)); *see also United States v. Oduloye*, 924 F.2d 116, 118 n. 1 (7th Cir.1991). As with an enhancement under § 3B1.1, "[t]he sentencing court's determination that a defendant obstructed justice [under § 3C1.1] is ... a finding of fact.... [and thus] our review is under a clearly erroneous standard." *Brown*, 900 F.2d at 1103.

Evidence at trial showed that when Danny learned of the "Operation Adobe" investigation, he gave approximately $35,000 in cash and securities to Cutkomp "for safekeeping." At his sentencing hearing, Danny stated that the $35,000 in drug proceeds was turned over to Cutkomp "to use in my defense to pay a lawyer or something"—in other words, so that he would be able to draw on it later to defend against the impending indictment. The district court determined that this evidence supported an enhancement under § 3C1.1. The court reasoned that "if someone has physical evidence of a crime, whether that be money or other documents, and those are turned over to someone else for safekeeping once that person is on notice that there is a criminal investigation in progress, then that meets the definition of obstructing." We think this ruling was sound. On appeal, Danny

argues that the enhancement should only have been granted on the money laundering charge, not on the marijuana trafficking charge. This argument is without merit. Danny attempted to conceal cash and securities, all of which were proceeds of marijuana sales and both of which were, consequently, evidence relevant to the drug trafficking charge. Even if we exclude the securities, the cash was a direct proceed from the drug sale and Danny's attempt to conceal it was properly considered to be obstruction under § 3C1.1.

## C. Scot Burkhead

■ Scot Burkhead pled guilty to counts charging him with conspiracy, money laundering, and tax evasion. In his plea agreement, Burkhead agreed to cooperate fully with the government in the prosecutions of codefendants Sorrells and Hollenback. In exchange for his cooperation, the government agreed to request a downward departure from his sentencing range. The district court granted the government's motion and, from a range of 235 to 293 months, sentenced Burkhead to 132 months incarceration.

On appeal, Burkhead claims that the government breached its plea agreement by informing the district court at his sentencing hearing that he had violated his bond by being arrested for driving under the influence, and that he had concealed his ownership of an automobile from the probation officer. Burkhead seems to be arguing that the government violated the spirit rather than the letter of the agreement, since he concedes in his brief that the government reserved the right in the written plea agreement to recommend any sentence up to and including the maximum permitted by law.[4] He nonetheless contends that a breach of the agreement oc-

---

of the guidelines. *United States v. Thomas*, 930 F.2d 526, 530–31 (7th Cir.1991); *United States v. Gentry*, 925 F.2d 186, 189 (7th Cir.1991). In other words, because the district court's discretion to depart downward is not unbridled, we cannot assume that the court will conclude that Brown merits the same sentence regardless of the size of the enhancement he receives under § 3B1.1.

4. Even though Burkhead focuses on the government's disclosure of the DUI arrest, it should be noted that the district court explicitly stated that it was unconcerned about this arrest. The court stated, however, that concealment of the ownership of the car demonstrated to some degree that Burkhead had not come completely clean and therefore did not deserve a larger departure.

curred because the government used this information to justify its decision to suggest what he feels was an unjustifiably meager downward departure in his sentence. Burkhead's view of his own sentence is evidently colored by the sentence Danny Brown received. Brown, who was responsible for distributing 4500 pounds of marijuana, was sentenced to 15 years; Burkhead, who distributed 2000 pounds, got 11 years. In Burkhead's view, a sentence of 7 years would be more proportionate to his crime in view of Danny Brown's sentence. As we have noted before, however, that a codefendant was treated differently is not a ground on which we may review a district court's sentencing decision that conforms with the requirements of the guidelines. *United States v. Smith*, 897 F.2d 909, 911 (7th Cir.1990).

### III.

Unlike the Browns and Burkhead, Randall Sorrells and Brian Hollenback did not enter into plea agreements. After a jury trial (at which the Browns and Burkhead testified), the two were convicted and now appeal both their convictions and the sentences the district court imposed on them. Both claim that the evidence at trial failed to support their convictions. We review challenges to criminal convictions based on the alleged insufficiency of the evidence by viewing the evidence and all reasonable inferences in the light most favorable to the government. *United States v. Ocampo*, 890 F.2d 1363, 1370 (7th Cir. 1989); *United States v. Nesbitt*, 852 F.2d 1502, 1509 (7th Cir.1988). We will reverse a conviction only if no rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Ocampo*, 890 F.2d at 1370; *Nesbitt*, 852 F.2d at 1509. As we have noted on more than one occasion, these criteria impose a heavy burden on defendants who seek to challenge the evidentiary sufficiency of their convictions. *United States v. Khorrami*, 895 F.2d 1186, 1190 (7th Cir. 1990); *Nesbitt*, 852 F.2d at 1509.

### A. Randall Sorrells

■ There was abundant evidence to support Sorrells' conviction for conspiracy. Danny Brown testified that over a period of several years he distributed as much as twenty pounds of marijuana per month to Sorrells. In addition to Danny Brown's testimony, there was evidence that Sorrells on at least one occasion purchased marijuana directly from Cutkomp in so large a quantity as to raise a strong inference that it would be resold. Also, it appears that Sorrells returned a large quantity of marijuana to Cutkomp because of its poor quality, evidence that directly connects Sorrells to the distribution ring. *See United States v. Auerbach*, 913 F.2d 407, 415 (7th Cir. 1990). In the face of this evidence, Sorrells simply maintains that Brown's testimony, and that of the other witnesses who testified against him, was either biased or otherwise unworthy of belief. He claims that Danny's testimony was unreliable because Brown had made a deal with the government to receive a lower sentence in exchange for his testimony against Sorrells; he also points to certain inconsistencies between names and dates in the testimony of other witnesses to prove their unreliability. We have said repeatedly that such arguments are for the jury, not this court. *United States v. Jackson*, 935 F.2d 832, 843 (7th Cir.1991) (citing cases). The existence of Danny's arrangement with the government, or of discrepancies in the testimony of government witnesses, should have been, and were, brought to the jury's attention; it was their role, not this court's, to assess the credibility of the government's case.

Sorrells also raises three issues with respect to his sentence. The district court imposed a sentence of 132 months incarceration from a sentencing range of 121–151 months. The court enhanced Sorrells' base offense level of 28 by one point under § 3B1.1 for being a supervisor, and by two points under § 3C1.1 for obstruction of justice.

■ First, Sorrells claims that the judge improperly calculated his base offense level when it attributed 501 kilograms of mari-

juana to him. The total weight was calculated by adding certain quantities Danny and the other witnesses claimed they distributed to Sorrells. Sorrells claims that this procedure was flawed because some of the marijuana involved came from other sources or was not marijuana that could properly be attributed to the Cutkomp conspiracy. The multiple-source theory was a central theme of Sorrells' defense at trial and at sentencing, but the theory hinged on the credibility of witness testimony regarding the dates of distributions between Sorrells and his initial distributor Darwin Scheckel, and later distributions between Sorrells and Danny Brown. Sorrells claimed at his sentencing hearing that, at most, he could be held responsible for approximately 225 kilograms of marijuana from the Cutkomp conspiracy (which would put him at a lower offense level).

A review of the sentencing hearing transcript reveals that the district court carefully weighed the evidence on this question. For example, Scheckel testified that he had distributed approximately 1400 pounds of marijuana to Sorrells, and purchased from Sorrells another 300 pounds. The court, noting some reliability problems in Scheckel's testimony, attributed only 408 pounds of marijuana to this relationship. In addition, the court took Sorrells' multiple sources defense into account by counting only marijuana distributed during the period when Cutkomp was supplying Scheckel or Danny Brown, the two suppliers from whom Sorrells obtained marijuana. The court rightly rejected the government's view that Sorrells' conspiracy conviction automatically carried with it liability for the total quantity of marijuana Cutkomp's other associates distributed (a conspiracy conviction establishes only that one has joined a criminal agreement; it does not mean that the conspiracy indictment accurately describes the parameters of the agreement or the parties to it—see *United States v. Townsend*, 924 F.2d 1385, 1389 (7th Cir.1991)). The district court conducted the foreseeability inquiry required by § 1B1.3 of the Sentencing Guidelines and concluded that Sorrells should be held accountable only for the 501 kilograms of marijuana he personally received. Having reviewed the transcript of Sorrells' sentencing hearing, we see no clear error in that conclusion. Indeed, we find the district court's conclusion to be the reasonable product of a thorough inquiry into the facts relating to the scope of Sorrells' involvement in the Cutkomp distribution network.

Sorrells next claims that the court improperly enhanced his base offense level by one under § 3B1.1(c) for being a supervisor or manager. The district court's thorough examination of the evidence at sentencing prompted it to express concern that there seemed to be no evidence in the record that Sorrells "actually supervise[d] anyone else as opposed to being a major buyer and perhaps selling to someone else." Sentencing Tr. at 114. The government's sole basis for requesting the enhancement was that Sorrells was a distributor of marijuana. The government maintained that while there was no evidence that Sorrells supervised others in the organization, the large quantity involved showed that he could be said to have exercised some control over his customers since they were often fronted the drugs on credit. The court, expressing some reservations about the enhancement, decided to award only a one-level enhancement, rather than the two-level enhancement called for in § 3B1.1(c).

As we noted above in regard to the enhancement for William Brown, the mere status of middleman or distributor does not support an enhancement under § 3B1.1 for being a supervisor, manager, or leader. Section 3B1.1 requires the exercise of some authority in the organization, the exertion of some degree of control, influence, or leadership. Sorrells' status as middleman is largely reflected in his base offense level—a figure calculated from the amount of drugs he was responsible for distributing. *Cf. Fuller*, 897 F.2d at 1220–21. Sorrells' enhancement under § 3B1.1 was improper in this instance because there was no *additional* evidence that demonstrated he exercised a leadership role in the offense. Sorrells fronted drugs to his customers, an

arrangement that may have given him considerable control over their activities (creditors *may* exert varying degrees of control over the affairs of their debtors), but the government pointed to no evidence suggesting that Sorrells actually exercised any control by means of the credit extended to his customers. We therefore vacate Sorrells' sentence and remand his case to enable the district court to resentence him without an enhancement under § 1B1.3.

■ Finally, Sorrells claims that the district court improperly increased his offense level for obstruction of justice under § 3C1.1. This claim is easily refuted. The district court cited two examples of obstruction that justified the enhancement: (1) Sorrells falsely denied under oath that he had a criminal record; and (2) he falsely denied under oath that he ever purchased drugs from Danny Brown or any other member of the Cutkomp conspiracy. These statements go beyond the simple denial of guilt protected by the "exculpatory no" doctrine—false denials made under oath are perjurious—and clearly warrant application of the § 3C1.1 enhancement. *See* Application Note 1.

### B. Brian Hollenback

■ Brian Hollenback was charged with one count of conspiracy to distribute marijuana, three counts of money laundering, and one count of conspiracy to impede an Internal Revenue Service investigation. Although the jury acquitted him on the drug conspiracy count, he was found guilty on the money laundering and tax counts. Hollenback appeals his conviction, arguing that the government failed to show that he had the requisite intent to commit the crimes for which he was convicted.

The following background is necessary to facilitate our discussion. Hollenback was a long-time friend of William Brown and became friends with Danny Brown in the mid–1970s. At this time Danny was operating a successful construction company in the Quad Cities area. Hollenback lived in the area as well, but moved away in the mid–80s. He returned for family visits and frequently saw the Browns on these visits. In fact, Danny supplied Hollenback with "up to a pound" of marijuana on some of his visits. After moving away, Hollenback lived in Louisiana and worked at a mortgage brokerage firm called Baton Rouge Mortgage Company (BRMC). David Lane Manning, the president of the company, hired Hollenback to run the business in 1985, and Hollenback stayed with the firm until mid–1986 when BRMC was unable to meet its payroll obligations. Hollenback then moved to Florida and began working in a similar capacity for another mortgage company.

In 1987, Hollenback called Brown to ask him if he would like to make an investment in the ailing BRMC. Brown and Hollenback both travelled to Louisiana, and once there Brown agreed to invest $5,000 in BRMC. A short time later, Hollenback again contacted Brown to determine whether he would be interested in investing approximately $20,000 in a second Louisiana mortgage company called River City Mortgage Company (RCMC). After another trip to Louisiana where he met with Hollenback and the two principals of RCMC, Brown invested approximately $23,100 in the company in increments of less than $10,000, each originating from separate banks.

In early 1988, Cutkomp contacted Brown to see if he could arrange to get Cutkomp's Arizona mortgage paid off. Brown contacted Hollenback in Florida, and Hollenback agreed to assist in the deal. Although Hollenback worked for a mortgage company in Florida that could have handled the deal (and would have provided him with a commission in the process), Hollenback contacted Manning at BRMC and asked his help in paying off a mortgage for "a friend's mother." At this point, BRMC was on the verge of bankruptcy. Hollenback knew about the precarious financial position of the company and was, in fact, still owed approximately $1,000 in back wages (the government's theory was that Hollenback wanted the deal to go through BRMC because evidence of the transaction would disappear when the company went out of business). Manning agreed to pro-

cess the papers and told Hollenback to transfer the necessary funds to BRMC's bank account. The mortgage totalled approximately $68,000, and Brown began transferring funds to BRMC's account in increments of less than $10,000. When the bank balked at the suspicious nature of the transfers, Manning told Hollenback to stop the transfers. At this point, not all of the $68,000 had been sent to the account so Hollenback supplied the final $11,000 necessary to meet the total mortgage amount by combining a $6,000 personal check and $5,000 in cash with the funds already transferred to the account. BRMC then paid out the funds to satisfy the mortgage on Cutkomp's Arizona residence.

Once the Operation Adobe investigation began to unfold, IRS agents attempted to track down the proceeds of the drug sales. An IRS agent interviewed Hollenback in Florida, and he denied being involved with or having knowledge of any investments involving Brown or any financial transactions involving Cutkomp. Hollenback persisted with this story even after being confronted with documents that clearly showed his involvement.

■ To obtain a conviction for money laundering under 18 U.S.C. § 1956(a)(1), the government was required to prove that Hollenback (1) knowingly conducted a financial transaction; (2) which he knew involved funds derived from criminal activity and which in fact involved the proceeds of drug distribution; (3) with the intent to promote "specified unlawful activity" as defined in 18 U.S.C. § 1956(c)(7)—*see* 18 U.S.C. § 1956(a)(1)(A)(i)—or, with knowledge that the transaction was designed to disguise the nature or source of the proceeds—*see* 18 U.S.C. § 1956(a)(1)(B)(i). *See also Jackson*, 935 F.2d at 838–39 (7th Cir. 1991). Although the indictment charged that Hollenback intended both to promote drug trafficking *and* to disguise proceeds derived from drug trafficking, the government's proof and argument, and the district court's instructions to the jury, went only to Hollenback's liability under § 1956(a)(1)(B)(i) for attempting to disguise the source of the proceeds. The possibility

that the jury nevertheless based its verdict on the first prong of the statute, § 1956(a)(1)(A)(i), though troubling in the abstract, is not fatal to the conviction, as we explained in *United States v. Townsend*, 924 F.2d 1385, 1412–14 (7th Cir.1991). *See also United States v. Beverly*, 913 F.2d 337, 357, 361–65 (7th Cir.1990), *cert. granted sub nom. Griffin v. United States*, —— U.S. ——, 111 S.Ct. 951, 112 L.Ed.2d 1039 (1991). Nevertheless, we renew our caution in *Jackson* that the government should in the usual case charge defendants under one prong of the statute or another as it will be the rare case in which the government will be able to prove "that a single transaction was intended to both promote an illegal activity *and* conceal the origin of the funds used in that activity." 935 F.2d at 842 (emphasis in original).

On appeal, Hollenback argues that the evidence was insufficient to convict him on the money laundering charge because the government did not introduce any evidence to show that Hollenback knew that the monies involved in the financial transactions with Brown and Cutkomp were derived from illegal drug activity. He offers a similar argument to challenge his conviction for impeding the IRS in computing or collecting taxes under 18 U.S.C. § 371.

Reviewing the evidence in the light most favorable to the government, as we must on appeal, we conclude that Hollenback's claims are unpersuasive. The evidence clearly showed that all of the transactions in question were carefully engineered to avoid the reporting requirements associated with transfers of $10,000 or more. *See* 31 U.S.C. §§ 5313(a) & 5324; *United States v. Davenport*, 929 F.2d 1169 (7th Cir.1991). If, as Hollenback claims, he was unaware of the nature of the proceeds, then these elaborate and time-consuming transfers made no sense. Hollenback would have us believe that, even though he had spent many years in the financial industry, he barely noticed the curious form the transfers took. In addition, Hollenback knew that Brown had ready access to large amounts of marijuana, since Brown was able to supply Hollenback with pound

quantities on occasion. Although these amounts apparently did not convince the jury that Hollenback was further distributing the marijuana that Brown had supplied him,[5] they constitute circumstantial evidence that Hollenback knew how Brown earned his living.

Hollenback claims that Brown had a successful construction business in the Quad Cities area and that he believed that the money in question came from this legitimate business source. Under this theory, even if Hollenback knew Brown sold marijuana, he did not know the money to be laundered came from the drug business. Thus, for example, Hollenback's purpose in laundering the money might merely have been to avoid paying taxes on it, and not to disguise its illegal nature or source. Hollenback's contention, however, was undercut by Brown's testimony at trial.

Brown testified that he informed Hollenback in 1986 and 1987 that the construction business had fallen on hard times and that his business was very slow. It was around the same time that Hollenback began soliciting "investments" from Brown for the Louisiana mortgage companies. Hollenback later claimed to an IRS agent that he had no financial dealings at all with Brown. He told the agent that he may have met Cutkomp "briefly," but had not engaged in any financial transaction with him either. At trial the government introduced, along with financial documentation disproving Hollenback's denials, long distance phone records showing numerous calls between phone numbers registered to Cutkomp in Arizona and Hollenback in Florida—calls that spanned a period of several months. This was in addition to evidence relating to the repayment of Cutkomp's mortgage loan which Hollenback admittedly facilitated through the nearly bankrupt BRMC. As we noted in *Jackson*, "[w]e must affirm unless the record is barren of any evidence, regardless of weight, from which the trier of fact could find guilt beyond a reasonable doubt." 935 F.2d at 840 (quoting *United States v. Atterson*, 926 F.2d 649, 655 (7th

Cir.1991) cert. denied *Laurelez v. U.S.,* —— U.S. ——, 111 S.Ct. 2909, 115 L.Ed.2d 1072 (1991) (citations omitted)). Hollenback did not meet this "formidable" burden. *See id.* It was certainly permissible for the jury to rely on this circumstantial evidence to find that Hollenback knew where the money was coming from and, with that knowledge, both assisted Brown and Cutkomp in laundering the proceeds through a nearly-bankrupt mortgage company and lied about his involvement in the scheme because he knew of the illegal nature of the proceeds.

### IV.

In conclusion, we AFFIRM the convictions of Randy Sorrells and Brian Hollenback, and AFFIRM the sentence of Scot Burkhead. We AFFIRM the sentences of William Brown, Danny Brown, and Randy Sorrells to the extent noted in this opinion, but VACATE their sentences on the issue of offense level enhancement under § 3B1.1 of the Guidelines and REMAND for resentencing consistent with this opinion.

---

**5.** Hollenback was acquitted of one count of conspiracy to distribute marijuana. At Hollenback's trial, Danny Brown specifically testified that Hollenback had no involvement in the marijuana conspiracy.