[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-14674
Non-Argument Calendar

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 3, 2011
JOHN LEY
CLERK

D.C. Docket No. 4:09-cr-00027-SPM-WCS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

TERRANCE MAURICE WASHINGTON,
a.k.a. Terrance Harris,
a.k.a. Little T,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(May 3, 2011)

Before TJOFLAT, MARTIN and FAY, Circuit Judges.

PER CURIAM:

Terrance Maurice Washington appeals his 125-month sentence for charges of (1) conspiracy to distribute and to possess with intent to distribute more than 5 kilograms of cocaine and more than 50 grams of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii)-(iii), 846, and (2) aiding and abetting the possession with intent to distribute more than 50 grams of cocaine base, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(iii), (b)(1)(C), and 18 U.S.C. § 2. He argues that the district court clearly erred in finding that he was an organizer, leader, manager, or supervisor of the conspiracy and, thus, in applying an offense-level enhancement pursuant to U.S.S.G. § 3B1.1(c). For the reasons set forth below, we affirm.

I.

In April 2008, federal agents used a confidential source ("CS") to arrange a cocaine transaction with Torey Walker. Agents observed Walker entering the CS's vehicle at the designated location. Using electronic surveillance, agents heard Walker tell the CS that "it will swim," which referred to powder cocaine that could be converted to crack cocaine. Walker gave the CS a Zaxby's cup containing a plastic bag that held approximately 27.4 grams of powder cocaine. Walker also agreed to sell the CS an additional nine ounces of powder cocaine at a later time. Walker stated that he would convert the powder to crack if the CS

2

wanted him to do so.

About a week later, on April 18, 2008, the CS advised agents that Walker was in possession of four ounces of crack cocaine and five ounces of powder cocaine, which he wanted to sell for $6,500. Agents observed the CS meeting at a local gas station with Walker, who was driving a blue truck. Agents later observed as Walker drove to an apartment building, exited the truck, and entered an apartment. He returned to the truck carrying a shoe box. He then returned to the gas station and entered the CS's vehicle with the shoe box. Agents immediately arrested Walker and retrieved the box, which contained approximately 115.2 grams (about 4 ounces) of crack cocaine.

Walker told agents that he obtained the crack cocaine from Tellis Harris. He said that Harris lent the truck to him so that he could make the delivery, and that Harris had agreed to pay Walker $150 to make the delivery. Walker and the agents returned to the apartment from which Walker had obtained the shoe box. The agents observed as Harris and Washington exited the apartment and Harris waved down a motorist who was entering the parking lot. As Washington and Harris approached the individual, the agents moved in. Harris and Washington fled on foot but were apprehended. As the men ran, Harris discarded a plastic bag containing ten grams of cocaine.

3

When questioned, Harris told the agents that he was working on a vehicle when Washington and Walker arrived and asked for a ride to the apartment. During the ride, Washington and Walker had discussed a drug transaction for which Washington was to supply Walker with 4.5 ounces of powder cocaine and 4.5 ounces of crack cocaine totaling $6,500. At the apartment, Washington cooked 4.5 ounces of powder cocaine into crack cocaine. Harris agreed to allow Walker to use his truck in order to make the delivery. He denied that he was Walker's source.

Washington possessed a key to the apartment, in which agents found cooking utensils and packaging material with suspected cocaine residue, a digital scale, and crack and powder cocaine. Additional crack cocaine was found in a cap under the driver's seat of Harris's truck. Agents found 134.1 grams (approximately 4.7 ounces) of powder cocaine inside the law-enforcement vehicle in which Walker had been placed. Washington was believed to have been the source for the drugs seized that day.

The probation office calculated a base offense level of 34, pursuant to U.S.S.G. § 2D1.1(a)(3), (c)(2), comment. (n.10(D)). Additionally, on grounds that Washington had "coordinated the events of April 18, 2008, and was directing the actions of Torey Walker related to the sale of cocaine to the confidential source,"

4

the probation office applied a two-level managerial enhancement, pursuant to U.S.S.G. § 3B1.1(c). With a 3-level reduction for acceptance of responsibility, U.S.S.G. § 3E1.1(a)-(b), Washington had a total offense level of 33. As he was in criminal history category IV, he was subject to a guideline range of 188 to 235 months' imprisonment and a term of 5 years' supervised release.

Washington objected that he did not coordinate the events of April 18th or direct Walker's actions. He stated that Harris had approached him that day in order to purchase "whatever drugs . . . Washington had available" because it was a Friday afternoon and payday, when drug sales are at their highest. Washington was told that Walker had a buyer for the drugs and that Walker wanted to use Washington's car to make the delivery. When Washington refused to lend his car to Walker, Harris offered his truck to Walker so that Walker could complete the sale. For this reason, Walker was arrested in Harris's truck. Therefore, Washington contended that he was not an organizer, leader, manager, or supervisor, and he should not have received the two-level enhancement.

At the sentencing hearing, the government argued that Washington "clearly exercised a managerial role." Harris had testified at Walker's sentencing hearing that Washington was going to receive $6,000 from the sale while Walker would keep the remaining $500. Harris also testified that Washington cooked the crack

5

cocaine at the apartment while Walker and Harris were present, and that

Washington put the drugs into the shoe box. The government contended that

Walker "cover[ed]" for Washington, which showed Walker's "allegiance" to him.

The government contended that Washington "was too intimately involved to have

not directed and controlled [Walker's] activities."

Washington argued that he did not exercise decision-making authority,

recruit accomplices, claim a right to a larger share of the fruits of the crime, play a

great role in planning or organizing the offense, or exercise any control and

authority over others. There was no evidence in the record that Washington was

involved in Walker's first sale to the CS. All of the evidence, he argued, showed

that Walker arranged the April 18th sale with the CS, including the amount of

drugs and the sale price. After the CS called to arrange the location, Walker asked

Harris whether he could borrow Harris's truck. Walker and Washington arranged

that Washington would front $6,500 worth of cocaine, and after the sale, he would

"basically get[] his money back" when Walker gave him $6,000 of the sale price.

Furthermore, Washington argued that Harris's testimony was internally

inconsistent and incredible. Washington found it significant that Harris had ten

grams of cocaine in his pocket when he ran from law enforcement.

The district court overruled the objection, finding by a preponderance of the

evidence that Washington had acted as a leader or supervisor in the conspiracy by directing Walker's April 18th transaction. The court sentenced Washington to 125 months' imprisonment and 5 years' supervised release, in light of the U.S.S.G. § 5K1.1 substantial-assistance motion that the government had filed on Washington's behalf.

## II.

A district court's determination of the defendant's role in the offense is reviewed for clear error. *United States v. De Varon*, 175 F.3d 930, 937 (11th Cir. 1999). "So long as the basis of the trial court's decision is supported by the record and does not involve a misapplication of a rule of law, . . . it will be rare for [us] to conclude that the sentencing court's determination is clearly erroneous." *Id.* at 945.

The government must prove the existence of an aggravating role by a preponderance of the evidence. *United States v. Yates*, 990 F.2d 1179, 1182 (11th Cir. 1993). "The findings of fact of the sentencing court may be based on evidence heard during trial, facts admitted by a defendant's plea of guilty, undisputed statements in the presentence report, or evidence presented at the sentencing hearing." *United States v. Saunders*, 318 F.3d 1257, 1271 n.22 (11th Cir. 2003) (quotation and alteration omitted).

Section 3B1.1 provides for aggravated-role enhancements based on the degree of the defendant's responsibility and the extent of the criminal activity:

(a)     If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by **4** levels.

(b)     If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by **3** levels.

(c)     If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by **2** levels.

U.S.S.G. § 3B1.1(a)-(c) (emphasis in original).

"'The mere status of a middleman or a distributor does not support enhancement under Section 3B1.1 for being a supervisor, manager, or leader. Section 3B1.1 requires the exercise of some authority in the organization, the exertion of some degree of control, influence, or leadership.'" *Yates*, 990 F.2d at 1182 (quoting with approval *United States v. Brown*, 944 F.2d 1377, 1385 (7th Cir. 1991)). "The assertion of control or influence over only one individual is enough to support a § 3B1.1(c) enhancement." *United States v. Perry*, 340 F.3d 1216, 1217 (11th Cir. 2003) (alteration omitted). Thus, where the defendant arranges drug transactions, negotiates sales, and hires others to work for the

conspiracy, a managerial-role enhancement is warranted. *United States v. Matthews*, 168 F.3d 1234, 1249-50 (11th Cir. 1999); *accord United States v. Shazier*, 179 F.3d 1317, 1320 (11th Cir. 1999); *United States v. Stanley*, 24 F.3d 1314, 1323 (11th Cir. 1994).

A finding that the defendant managed only the assets of a conspiracy, such as by supplying and maintaining control over the cocaine in a drug-distribution conspiracy, is not sufficient to support a § 3B1.1(c) enhancement. *United States v. Glover*, 179 F.3d 1300, 1302-03 (11th Cir. 1999). However, in *United States v. Howard*, 923 F.2d 1500, 1503 (11th Cir. 1991), we held that the district court did not clearly err when it found that, "but for the credit that Howard was willing to extend to [co-conspirator] Hall, Hall would have been unable to purchase cocaine from Howard and to sell that cocaine to others," and, thus, "[a]s a source of credit, . . . Howard maintained at least constructive control over Hall."

Here, there is no indication in the record that Washington arranged the April 18th sale, set or negotiated the terms of the sale, hired Walker to execute the sale, exerted any direct control or influence over Walker's actions, required Walker to consult with him before the sale, or received a greater share of the profits. *See Matthews*, 168 F.3d at 1249-50; *Yates*, 990 F.2d at 1182. Nevertheless, the government did present evidence that Washington fronted cocaine on credit to

9

Walker, which enabled Walker to carry out his independently negotiated sale to the CS. *See Howard*, 923 F.2d at 1503. Therefore, it is not clear that the district court erred in determining that Washington's conduct warranted a § 3B1.1(c) enhancement. *See De Varon*, 175 F.3d at 937, 945.

For the foregoing reasons, we affirm Washington's sentence.

**AFFIRMED.**