[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 14, 2011
JOHN LEY
CLERK

No. 09-13649
Non-Argument Calendar

_____

D. C. Docket No. 08-00228-CR-ORL-22-KRS

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ALBA RIVERA,
a.k.a. Nivi,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(June 14, 2011)

Before EDMONDSON, PRYOR and FAY, Circuit Judges.

PER CURIAM:

Alba Rivera appeals her 120-month, mandatory-minimum sentence for conspiracy to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii), 846. She argues that the district court erred in applying a two-level enhancement, pursuant to U.S.S.G. § 3B1.1(c), based on the finding that she was a manager or supervisor in the conspiracy. She further argues that the district court erred in denying her safety-valve relief pursuant to 18 U.S.C. § 3553(f). For the reasons set forth below, we affirm.

I.

Rivera pled guilty without a negotiated agreement. At her change-of-plea hearing, the government set forth the following factual basis for the plea. Beginning in 2006 and continuing through June 2007, a drug trafficking organization mailed cocaine almost every week from Puerto Rico to Orlando, Florida, in United States Postal Service parcels. Each package contained between one and three kilograms of cocaine. Miguel Montes, a leader and organizer of the operation in Orlando, sold and distributed kilogram quantities of cocaine directly to eight named individuals and other unindicted co-conspirators. Jonathan Melendez also was identified as the leader and organizer of a group participating in the cocaine distribution. Melendez received kilogram quantities of cocaine from Puerto Rico, which various associates transported to him from the addresses in the

2

Orlando area to which the parcels had been mailed. Rivera and four named individuals were associated with Melendez in the receipt and distribution of cocaine. At times, Melendez obtained cocaine from Montes.

A number of individuals in the Orlando area were recruited and paid to receive parcels containing cocaine and to deliver the parcels to couriers. Rivera was recruited and paid by codefendant Yahaira Cordero, both to receive parcels and to provide new names and addresses to which parcels could be mailed. Investigators determined that Rivera, in turn, recruited Maria Adames, Edgardo Rivera-Ocana, and an unindicted neighbor to receive parcels of cocaine. Rivera and Cordero were roommates, and Rivera knew that the parcels she received contained cocaine. Cordero paid Rivera $500 for each parcel she or her recruits received, and Rivera paid her recruits from that amount. Investigators also determined that Rivera had recruited Jorge Rivera ("Jorge") and an individual named Yesette to receive parcels at two particular addresses. Rivera admitted the truth of the allegations, and the court accepted her plea.

In calculating Rivera's guideline sentencing range, the probation office assigned a base offense level of 34, pursuant to U.S.S.G. § 2D1.1(c)(3). It also concluded that Rivera was an organizer, leader, manager, or supervisor in the organization due to her recruitment of others and the fact that she received a

3

portion of the payments her recruits received. Accordingly, it added a two-level managerial enhancement, pursuant to U.S.S.G. § 3B1.1(c). After a 3-level reduction for acceptance of responsibility, Rivera had a total offense level of 33. With a criminal history category of I, Rivera had a guideline range of 135 to 168 months' imprisonment, and she was subject to a statutory mandatory-minimum term of 10 years' imprisonment. Rivera objected, in relevant part, that she should not have received the role enhancement, and she requested safety-valve relief.

At the sentencing hearing, Agent Ray Schulte testified that Rivera recruited Rivera-Ocana, Adames, Jorge, and a woman named Rosanna Cortijo to receive packages for Melendez. Rivera-Ocana told investigators that Rivera had recruited both him and Adames, and that he and Adames each received three to four packages, which they gave to Rivera. Adames also told investigators that Rivera had recruited her and Rivera-Ocana. Schulte further testified that Melendez paid Cordero $1,000 per parcel, and she, in turn, paid Rivera $500. If the parcel had been received by one of Rivera's recruits, Rivera would pay that person $200. Postal records corroborated the involvement of the various co-conspirators.

Schulte testified that Rivera had met with investigators twice in order to make a proffer. The agents terminated the first session because they felt that she was not being forthcoming with information they had previously received from

4

other people regarding Rivera's receipt of packages for another individual, her knowledge of the scope of the activity, the identities of the individuals involved, and the method for receiving parcels. At her second proffer session, she provided no new information, even though investigators already had received very specific information from Cordero, Rivera-Ocana, and Adames regarding Rivera's involvement, as well as information that Rivera had attempted to recruit a woman named Giorliana Cortijo. The government also knew that Rivera had recruited Jorge and that the man who originally had recruited Rivera, prior to her involvement in the Melendez conspiracy, was named Thomas Sepulveda. When given the opportunity to identify those two men, however, Rivera did not.

On cross-examination, Schulte said that, during Adames's proffer session, she stated that she had approached Rivera and asked to receive packages, rather than being recruited by Rivera. On one occasion, Rivera went with Cordero to deliver a package to Melendez. On subsequent occasions, though, Cordero instructed Rivera to wait at a location several blocks away from Melendez's location, because Melendez did not want Rivera to know where he now lived.

Rivera testified that she had told the government that Adames asked to join the organization, and that Rivera-Ocana worked only with Adames, not with Rivera. She told the government what she knew, and she was willing to testify.

She denied that she was directly involved with supervising any of the individuals involved in the operation. Rivera stated that she knew only Rivera-Ocana and Melendez, and she denied any involvement with Jorge. She also had told the government that she did not recruit Rivera-Ocana, and that Rivera-Ocana used to deal marijuana. Rivera stated that Cordero gave her $500 per parcel and that Rivera kept $200 of each payment for herself. In total, she received less than $2,000 for her involvement in the scheme. On cross-examination, Rivera denied knowing Sepulveda. She said that she had told the investigators that Jorge and Rivera-Ocana were dealing on the side with Giorliana, their sister-in-law, and that Rivera knew them through Adames but had nothing to do with them.

Agent Schulte further testified that, during a proffer session, Rivera had admitted to (1) recruiting Rivera-Ocana and Adames to receive parcels, (2) receiving approximately four parcels at Adames's address, and (3) receiving four or five parcels at her own address. Rivera and Cordero both had said that they paid $300 to the recipient of the parcel, either Adames or Rivera-Ocana, and that Rivera and Cordero would each keep $100. The government had terminated the proffer because it believed that Rivera was not telling the truth, specifically with regard to Jorge and Sepulveda. Schulte further stated that Cordero had told investigators of Rivera's pre-conspiracy involvement with Sepulveda, and that several other

6

codefendants had told the government that Rivera had recruited Jorge.

Rivera argued that she had taken responsibility for her actions, but she denied recruiting Rivera-Ocana, and she asserted that Adames had approached her. The drug ring was huge, and Rivera's role was minimal. She was not involved in directing any activity other than receiving packages. She did not receive a large number of packages, recruit a large number of people, or control day-to-day operations. Therefore, she contended that the managerial-role enhancement should not be applied. Without that enhancement, she argued that she met all of the requirements for safety-valve relief, including having cooperated with the government. She stated that she had told the government truthfully everything that she knew, although she was not able to confirm everything the government had asked her with respect to specific individuals and their involvement.

The government responded that it was not particularly relevant whether Adames volunteered or was approached, as Rivera managed her from that point forward. It indicated that Rivera provided her recruits' addresses to either Cordero or Melendez and arranged for couriers to obtain the boxes from the recipients. She would pay the people involved and keep some money for herself. That role qualified her as a manager or supervisor, which precluded her from safety-valve relief. Furthermore, the government did not believe that Rivera had been entirely

truthful or that she had revealed everything that she knew. Therefore, she would not be eligible for safety-valve relief, regardless of her role in the offense.

The court found that Rivera was significantly involved in the conspiracy, and it overruled the objection to the role enhancement. It stated that there was "no way for [the court] to honestly conclude that she was not in a managerial role." In light of that finding, she was ineligible for safety-valve relief. Additionally, the court found that Rivera had not been completely honest and forthcoming with regard to her involvement in and knowledge of the conspiracy. The court adopted the guideline calculations in the presentencing investigation report and sentenced Rivera to 120 months' imprisonment and 5 years' supervised release.

## II.

A district court's determination of the defendant's role in the offense is reviewed for clear error. *United States v. De Varon*, 175 F.3d 930, 937 (11th Cir. 1999). "[A] similar fact pattern may on occasion give rise to two reasonable and different constructions. . . . [A] trial court's choice between 'two permissible views of the evidence' is the very essence of the clear error standard of review." *Id.* at 945. Thus, "[s]o long as the basis of the trial court's decision is supported by the record and does not involve a misapplication of a rule of law, . . . it will be rare for [us] to conclude that the sentencing court's determination is clearly erroneous." *Id.*

8

The government must prove the existence of an aggravating role by a preponderance of the evidence. *United States v. Yates*, 990 F.2d 1179, 1182 (11th Cir. 1993). "The findings of fact of the sentencing court may be based on evidence heard during trial, facts admitted by a defendant's plea of guilty, undisputed statements in the presentence report, or evidence presented at the sentencing hearing." *United States v. Saunders*, 318 F.3d 1257, 1271 n.22 (11th Cir. 2003) (quotation and alteration omitted).

Sentencing Guidelines § 3B1.1 provides for aggravated-role enhancements based on the degree of the defendant's responsibility and the extent of the criminal activity:

> (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by **4** levels.
>
> (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by **3** levels.
>
> (c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by **2** levels.

U.S.S.G. § 3B1.1(a)-(c) (emphasis in original).

"'The mere status of a middleman or a distributor does not support enhancement under Section 3B1.1 for being a supervisor, manager, or leader.

9

Section 3B1.1 requires the exercise of some authority in the organization, the exertion of some degree of control, influence, or leadership.'" *Yates*, 990 F.2d at 1182 (quoting with approval *United States v. Brown*, 944 F.2d 1377, 1385 (7th Cir. 1991)). "The assertion of control or influence over only one individual is enough to support a § 3B1.1(c) enhancement." *United States v. Perry*, 340 F.3d 1216, 1217 (11th Cir. 2003) (alteration omitted).

Considering both Schulte's testimony at sentencing and Rivera's admissions during the plea colloquy, the government presented evidence that Rivera recruited Rivera-Ocana, Jorge, and other individuals to join the Melendez operation, and that she took on Adames as a recruit when Adames asked to join the operation. The government also presented evidence that Rivera arranged for the recruits to begin receiving parcels by providing their names and addresses to Cordero, and that she directly paid at least Adames and Rivera-Ocana for receiving the parcels. The district court did not clearly err in finding that her involvement rose to the level of a managerial or supervisory role in the conspiracy. *See De Varon*, 175 F.3d at 937.

### III.

When reviewing a district court's findings as to a defendant's safety-valve eligibility, we review the district court's legal interpretation of the statute and Guidelines *de novo* and its factual determinations for clear error. *United States v.*

*Poyato*, 454 F.3d 1295, 1297 (11th Cir. 2006).

The safety-valve provision requires the district court to sentence the defendant without regard to any applicable statutory mandatory-minimum sentence if all of the following five criteria are met:

> (1) the defendant does not have more than 1 criminal history point, as determined under the [S]entencing [G]uidelines;
>
> (2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
>
> (3) the offense did not result in death or serious bodily injury to any person;
>
> (4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the [S]entencing [G]uidelines and was not engaged in a continuing criminal enterprise . . . ; and
>
> (5) not later than the time of the sentencing hearing, the defendant has truthfully provided to the [g]overnment all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan . . . .

18 U.S.C. § 3553(f).  Here, the district court found that Rivera had failed to satisfy the fourth and fifth elements of the statute.  As its finding with respect to Rivera's managerial role was not clearly erroneous, *see Poyato*, 454 F.3d at 1297, it did not err in denying her safety-valve relief, *see* § 3553(f)(4).

For the foregoing reasons, we affirm Rivera's sentence.

**AFFIRMED.**