United States Court of Appeals

FOR THE EIGHTH CIRCUIT

_____

No. 96-1265

_____

United States of America,              *
                                        *
        Appellee,                       *
                                        *   Appeals from the United States
            v.           *              District Court for the Eastern
                                        *   District of Missouri.
Linda Sue Bryson, Also Known            *
as Linda   Sue Campbell, Also           *
Known as Linda   Nolting, Also          *
Known as Karen Nolting, Also            *
Known as Linda Sue Vehlewald,           *
                                        *
        Appellant. *

_____

No. 96-1359

_____

United States of America,              *
                                        *
        Appellee,                       *
                                        *
            v.                          *
                                        *
Henrietta Furnish, Also Known           *
as Hank,                                *
                                        *
        Appellant. *

No. 96-1362

United States of America,

     Appellee,

     v.

Ronnie Furnish,

     Appellant.

Submitted: November 21, 1996

Filed: April 7, 1997

Before McMILLIAN and MORRIS SHEPPARD ARNOLD, Circuit Judges, and BOGUE,[1] District Judge.

MORRIS SHEPPARD ARNOLD, Circuit Judge.

The three defendants were indicted, along with seven others, on one count of conspiracy to distribute, and to possess with the intent to distribute, more than one kilogram each of methamphetamine and heroin. See 21 U.S.C. § 841(a)(1), § 846. The conspiracy was alleged to have existed between December, 1992, and June, 1995. After a two-day trial, a jury convicted Linda Bryson. After a separate seven-day trial, a jury convicted Ronnie Furnish and Henrietta Furnish (who are husband and wife) and three co-defendants whose cases we do not address in this opinion.

---

[1]The Honorable Andrew W. Bogue, United States District Judge for the District of South Dakota, sitting by designation.

-2-

Ms. Bryson and Mr. Furnish appeal both their convictions and their sentences. Ms. Furnish appeals only her conviction. We affirm the convictions of all three defendants but remand the cases of Ms. Bryson and Mr. Furnish for resentencing.

I.

As far as we can tell, Ms. Bryson was first arrested in late March, 1995. We note the date of Ms. Bryson's initial arrest because of the wording of her pretrial motions to suppress, both of which requested the exclusion of "all statements ... taken from [Ms. Bryson] ... at any time following her initial arrest." Despite the specificity of those requests, however, at hearings on pretrial motions, both Ms. Bryson and the government seemed to assume that Ms. Bryson was challenging the admissibility of statements that she gave in June, 1994, during a police interview at the St. Louis airport and in February, 1995, during a police interview at her residence, even though both of those dates are prior to her initial arrest. Both parties presented proof on those issues.

Ms. Bryson's motions to suppress also requested the exclusion of "all evidence obtained ... by means of a search ... of [Ms. Bryson's] residence." Despite the specificity of that request, however, at hearings on pretrial motions, both Ms. Bryson and the government seemed to assume that Ms. Bryson was challenging the admissibility of money and hypodermic needles found in a search of her luggage during the airport interview, even though that search was not at her residence. Both parties presented evidence on that issue.

The magistrate judge[2] who conducted the hearings on pretrial motions made findings of fact and recommendations with respect to the statements and evidence described above. The trial court ruled on those issues as well. Even on appeal, the government says nothing about this apparent discrepancy between the motions and the proof.

Under these circumstances, we too are inclined to address all of the matters argued in the trial court, proceeding as if Ms. Bryson's motions requested the exclusion of "all statements" and "all evidence obtained .. by means of a search." See, e.g., 3 C. Wright, Federal Practice and Procedure: Criminal 2d § 673 at 769 (1982). See also United States v. Hall, 565 F.2d 917, 919-20 (5th Cir. 1978); United States v. Wylie, 462 F.2d 1178, 1182 (D.C. Cir. 1972); and United States v. Lucas, 360 F.2d 937, 938 (6th Cir. 1966) (per curiam), cert. denied, 385 U.S. 875 (1966). We therefore turn to each of the incidents referred to above.

II.

In June, 1994, acting on suspicion that Ms. Bryson might be "involved in drugs," a police officer stopped Ms. Bryson and a friend at the St. Louis, Missouri, airport, identified herself to them as a police officer, and asked if Ms. Bryson was going to Los Angeles; Ms. Bryson said that she was. (We recount the facts as found by the magistrate judge based on the testimony of two police officers at a suppression hearing; Ms. Bryson did not testify.) The officer was not wearing a uniform, and her weapon was not visible. The officer then asked Ms. Bryson if they could talk; Ms. Bryson agreed.

---

[2]The Honorable Mary Ann L. Medler, United States Magistrate Judge, United States District Court for the Eastern District of Missouri.

The police officer asked if she could see Ms. Bryson's ticket, and Ms. Bryson gave the officer the ticket. The officer then asked if Ms. Bryson was the person whose name was on the ticket. Ms. Bryson responded that the ticket was in her sister's name but that her sister was unable to go. When asked for some identification, Ms. Bryson offered a driver's license in the name of "Linda Campbell." The officer then returned the ticket and the driver's license and asked Ms. Bryson why she was going to California; Ms. Bryson's response was that she was going to visit a friend but that the friend "doesn't have anything to do with this."

At that point, the police officer asked if she could search Ms. Bryson's carry-on bag. Ms. Bryson agreed, and the officer searched the bag but found nothing of moment. Approximately three minutes had elapsed since the officer had first stopped the two women. The officer then asked about checked bags, and Ms. Bryson said that she had four and gave her ticket envelope (with claim checks attached) to the officer. When asked if the officer could search her checked bags, Ms. Bryson agreed.

In the meantime, a second police officer (who had been interviewing Ms. Bryson's friend) had arrested the friend for possession of marijuana and methamphetamine, a development of which Ms. Bryson was aware. The officers told Ms. Bryson that they were detaining her friend, and the officer who had been questioning Ms. Bryson asked if she would return to the office with them. When asked to observe the search of her checked bags, Ms. Bryson agreed to do so. Approximately 20 to 30 minutes had elapsed since the search of Ms. Bryson's carry-on bag.

During the search of Ms. Bryson's checked bags, the police officers found approximately $12,000 and some hypodermic needles. A drug dog alerted "positive" to the money as having "a narcotic odor." Although they did not arrest Ms. Bryson, the officers seized the money. In an interview with the second officer after the money was discovered, Ms. Bryson at first asserted that the money belonged to someone whose name it was not in her best interest to give. When asked to whom a receipt should be made out, however, she said that the money belonged to her.

Ms. Bryson moved to suppress the money and hypodermic needles found in her checked bags and her statements to the police officers. She asserted that when the officers asked her to accompany them to their office and retrieved her checked bags, a consensual encounter became a seizure that lacked probable cause, and thus that the money and hypodermic needles should be suppressed. She argued, as well, that because she was not given the warnings required under Miranda v. Arizona, 384 U.S. 436, 467-73, 478-79 (1966), for custodial interrogations, her statements should be suppressed.

The magistrate judge concluded that Ms. Bryson's encounter with the police officers never turned into a seizure. The trial court agreed. Ms. Bryson does not challenge any of the magistrate judge's factual findings as clearly erroneous. See, e.g., United States v. McKines, 933 F.2d 1412, 1426 (8th Cir. 1991) (en banc), cert. denied, 502 U.S. 985 (1991). Rather, the essence of her argument on appeal is that the trial court erred in concluding that no seizure occurred. We review de novo the conclusion that no seizure occurred. See, e.g., id. at 1424, 1426.

Generally, a seizure within the meaning of the fourth amendment occurs only if, considering all of the circumstances of the incident, a reasonable person would believe that he or she is not free to leave. See, e.g., id. at 1415, 1416 n.3. The courts have recognized the "fact-intensive" yet "imprecise nature of [the] inquiry." Id. at 1419. "The test is necessarily imprecise, because it is designed to assess the coercive nature of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." Michigan v. Chesternut, 486 U.S. 567, 573 (1988). We consider, therefore, whether all of the circumstances involved in Ms. Bryson's initial encounter with the police officers were "so intimidating, threatening or coercive that a reasonable person would not have believed himself [or herself] free to leave." United States v. McKines, 933 F.2d at 1419.

Ms. Bryson directs our attention to Buffkins v. City of Omaha, 922 F.2d 465, 469 (8th Cir. 1990), cert. denied, 502 U.S. 898 (1991), in which our court held that a seizure occurred when two police officers "requested [the defendant] to accompany them to the office ... [and] at that time seized her luggage ... [by] picking [it] up." In that case, however, the officers told the defendant's friend that she was "free to go" but made no such statement to the defendant. Indeed, our court specifically concluded that the "officers' conflicting statements" to the defendant and her friend would have led to a reasonable belief on the defendant's part that she was not free to go. Id. In Ms. Bryson's case, it was Ms. Bryson's friend who was arrested, and thus "had no choice but to go with the officers," id., and Ms. Bryson who could have "reasonably infer[red]," id., that she, in contrast to her friend, was free to go. We note as well that it was Ms. Bryson who gave the claim checks to the officer after being asked about checked

-7-

bags, rather than the officer's physically commandeering those bags, <u>see id.</u>, from Ms. Bryson's possession.

Ms. Bryson also relies on <u>Florida v. Royer</u>, 460 U.S. 491, 501, 503 (1983) (plurality opinion), in which the Supreme Court held that a seizure occurred when two police officers retained the defendant's ticket and identification, asked the defendant to accompany them to an office, and used the defendant's claim checks to retrieve his checked bags without his "consent or agreement," <u>id.</u> at 494 (plurality opinion).  In our case, however, the officer had returned Ms. Bryson's ticket and driver's license before asking about checked bags and did not take physical control of those bags until after Ms. Bryson responded that she had four checked bags and handed her ticket envelope, with claim checks attached, to the officer.

We believe that Ms. Bryson's case is more analogous to <u>United States v. Dennis</u>, 933 F.2d 671, 673 (8th Cir. 1991) (<u>per</u> <u>curiam</u>);  <u>United States v. McKines</u>, 933 F.2d at 1422-23, 1426; and <u>United States v. Poitier</u>, 818 F.2d 679, 683 (8th Cir. 1987), <u>cert.</u> <u>denied</u>, 484 U.S. 1006 (1988), where our court found that no seizure had occurred when the police officers were not uniformed, did not openly display their weapons, and did not physically touch the defendant; <u>see</u> <u>also</u> <u>United States v. Delaney</u>, 52 F.3d 182, 186 (8th Cir. 1995), <u>cert.</u> <u>denied</u>, 116 S. Ct. 209 (1995), and <u>United States v. Todd</u>, 963 F.2d 207, 210 (8th Cir. 1992).  We therefore hold that no seizure of Ms. Bryson occurred when the officers asked about her checked bags and asked her to accompany them to their office, where Ms. Bryson's checked bags were brought.  Since there was no seizure, the officers were not required to give <u>Miranda</u> warnings to Ms. Bryson before she made any statements in the office.  <u>See</u> <u>Miranda</u>, 384 U.S. at 467-73, 478-79.  The trial court's refusal to

suppress the money, the hypodermic needles, and Ms. Bryson's statements was thus not error.

## III.

In February, 1995, two police officers and a DEA agent went to Ms. Bryson's residence in St. Louis, Missouri, to try to find her. (We recount the facts as found by the magistrate judge based on the testimony of one of the police officers and the DEA agent at two different suppression hearings; Ms. Bryson did not testify at either hearing.) At that time, the indictment against her had been issued but was still under seal. Ms. Bryson's son directed the officers and the DEA agent to a second house, where one of the officers and the DEA agent found Ms. Bryson (the second officer stayed at the residence).

The police officer and the DEA agent identified themselves and told Ms. Bryson that she was a target of a drug investigation. They asked if they could speak with her, and Ms. Bryson agreed but stated that she would rather return to her residence instead of talking outside. After the police officer advised Ms. Bryson of her Miranda rights, and she said that she understood them, Ms. Bryson, the officer, and the DEA agent returned to her residence.

Ms. Bryson, both police officers, and the DEA agent went inside, where the law enforcement officers asked for her cooperation in their investigation, which, they stated, would be taken into consideration. Specifically, they asked for information about her role in distributing methamphetamine. Ms. Bryson stated that she ordered methamphetamine from Henrietta Furnish (a
co-defendant), gave the money to Robert Avila (a co-defendant who pleaded guilty and testified for the government), and then received

the methamphetamine from Ms. Furnish.  Ms. Bryson admitted that she had recently received a pound of methamphetamine from Ms. Furnish and told the two officers and the DEA agent that it was hidden in the house where they originally found her.  The questioning took about 45 minutes.  At some point Ms. Bryson signed  forms consenting to a search of both houses.

Ms. Bryson, the two police officers, and the DEA agent then returned to the house where they originally found her, and she gave them the pound of methamphetamine that she had told them about.  The law enforcement officers also found two one-ounce packages of methamphetamine, which Ms. Bryson said she had obtained from Mr. Avila the previous week.

Ms. Bryson subsequently went with the law enforcement officers to the DEA office, where the DEA agent typed a summary of the information that Ms. Bryson had given.  She initialed a form indicating that she had been advised of her <u>Miranda</u> rights and that no "threats, force, or promises of rewards" had been used in obtaining the statement.  In response to the DEA agent's inquiry, Ms. Bryson said that the typed summary of her statements was accurate; she then signed it "Linda Campbell" and initialed each page.

Ms. Bryson moved to suppress her statements and the drugs that the law enforcement officers found.  Ms. Bryson argued, first, that because the DEA agent did not recall hearing her receive her <u>Miranda</u> rights, they were not given; that she was effectively in custody at the time she gave her statements; and that the statements should therefore be suppressed as having been induced without prior <u>Miranda</u> warnings.  She also argued that because she was under indictment even though unaware of it, her sixth amendment

right to counsel had attached, and therefore that the law enforcement officers were actively interfering with that right by telling her only that she was a target of a drug investigation rather than that she had already been indicted.  Ms. Bryson further argued that her alleged waivers of her Miranda rights and her sixth amendment rights were not fully informed because of her lack of awareness of the indictment.  Finally, she contended that her consents to answer questions and to allow the house searches were obtained by deceit so egregious as to amount to coercion under the law, and therefore were not voluntary under the law.

The magistrate judge found that one of the police officers advised Ms. Bryson of her Miranda rights.  The magistrate judge also found that Ms. Bryson's consents to answer questions and to allow the searches were voluntary and not coerced.  The trial court adopted all of those findings.

It is true that at one of the suppression hearings the DEA agent testified that Ms. Bryson was never given Miranda warnings "because she was never placed under arrest."  At the other suppression hearing, however, one of the police officers testified that he advised Ms. Bryson of those rights "when we approached her."  From all of that testimony, the magistrate judge concluded that the DEA agent "apparently was out of earshot when [the police officer] advised Ms. Bryson of her rights."  In reviewing the magistrate judge's findings, the trial court concluded that the police officer "advised [Ms. Bryson] of her Miranda rights verbally, out of the hearing of the DEA agent."

We have read the transcripts of both suppression hearings.  The finding that Ms. Bryson was indeed advised of her Miranda rights is not clearly erroneous.  See, e.g., United States v. 

-11-

Chaidez, 906 F.2d 377, 385 (8th Cir. 1990), and United States v. Capers, 685 F.2d 249, 252 (8th Cir. 1982) (per curiam); see also United States v. Dickson, 58 F.3d 1258, 1265 (8th Cir. 1995), modified on other grounds, 64 F.3d 409 (8th Cir. 1995), cert. denied, 116 S. Ct. 747 (1996), and Atwell v. State of Arkansas, 426 F.2d 912, 913-14 (8th Cir. 1970).

It is also true that Ms. Bryson's sixth amendment right to counsel attached once she was indicted. See e.g., United States v. Gouveia, 467 U.S. 180, 187-89 (1984); see also Kirby v. Illinois, 406 U.S. 682, 688-90 (1972) (plurality opinion). Our court has held, however, that law enforcement officers, with the consent of a suspect, may question even suspects who are unaware of their own indictment. Our court has further held that the officers have no duty to make such suspects aware of an indictment. See, e.g., United States v. Chadwick, 999 F.2d 1282, 1284-86 (8th Cir. 1993). We turn, then, to the question of whether Ms. Bryson's consent to answer questions was fully informed.

The Supreme Court has held that the Miranda warnings are sufficient to advise a suspect of the sixth amendment right to counsel and, therefore, that a valid waiver after being advised of Miranda rights is also a knowing waiver for sixth amendment purposes, see, e.g., Patterson v. Illinois, 487 U.S. 285, 291-300 (1988), except in certain circumstances not present here, see, e.g., id. at 296-97 n.9. See also United States v. Chadwick, 999 F.2d at 1285. We therefore reject Ms. Bryson's argument that her lack of awareness of the indictment rendered her consent to answer questions not "knowing" under the law.

Ms. Bryson asserts that by telling her that she was only a target of a drug investigation and not that she had actually been

indicted, the law enforcement officers engaged in deceit so extensive as to amount to coercion. She contends, therefore, that her consents to answer questions and to allow the house searches were involuntary under the law.

It is true that in some cases, a consent has been rendered involuntary under the law because of deception on the part of a law enforcement officer. See, e.g., United States v. Bosse, 898 F.2d 113, 115 (9th Cir. 1990) (per curiam); United States v. Carter, 884 F.2d 368, 374-75 (8th Cir. 1989); and United States v. Tweel, 550 F.2d 297, 299-300 (5th Cir. 1977). See also United States v. Briley, 726 F.2d 1301, 1304-05 (8th Cir. 1984). None of those cases, however, involved circumstances even close to those present in this case.

Ms. Bryson was told not only that she was a target of an investigation but also that it was a drug investigation. We do not believe that the law enforcement officers' request for cooperation in those circumstances would inevitably lead a reasonable person to believe that "she was being given an opportunity to make things easier on herself, turn informant, and perhaps even escape being charged," as Ms. Bryson contends in her brief. Furthermore, although she asserts in her brief that she was "inveigled" into entering a cooperation agreement, and that the officers' representations to her "evoked" "fears and hopes" on her part, in fact she offered no evidence to support those contentions at either of the suppression hearings. Under those circumstances, we decline to hold that her consents to answer questions and to allow the house searches were involuntary.

IV.

During trial, the court admitted evidence of Ms. Bryson's 1987 federal conviction for distributing methamphetamine. Ms. Bryson argues that five years is too remote in time from the onset of the alleged conspiracy and that the government offered no proof, other than the bare title of the offense, to show that the prior conviction was for acts similar to those charged in the present case. Ms. Bryson further argues that any probative value of the prior conviction was far outweighed by its unfair prejudicial effect. See Fed. R. Ev. 403.

The trial court also admitted evidence that when Ms. Bryson was arrested in October, 1995, for the second time (having fled after her initial arrest in March, 1995), the three police officers who arrested her found, in the truck in which she was riding, a pair of medical clamps, five hypodermic syringes (four of them apparently already used), and two ballpoint pen tubes that contained "an unknown residue." After the arrest, Ms. Bryson stated that the items found in the truck were hers. Finally, the trial court admitted evidence that when the residence of the truck's owner (where Ms. Bryson had evidently been living) was searched subsequent to Ms. Bryson's arrest, the police officers who arrested her found "a spoon with white powder residue, two crack pipes, [a] marijuana pipe, and a small amount of marijuana."

With respect to the apparent drug paraphernalia, Ms. Bryson notes that the only drugs potentially evident at the time of her arrest were the residues in the four hypodermic syringes and the ballpoint pen tubes, the white powder residue in a spoon, and the marijuana, a drug that was not included in the charges (since the alleged conspiracy was to distribute methamphetamine and heroin). As to the residues, Ms. Bryson argues that they represented

evidence of nothing more than personal use, that they were therefore only barely relevant to the charge of conspiracy to distribute, and thus that their unfair prejudicial effect exceeded by far any probative value that they might have had.  See Fed. R. Ev. 403.

At the time that all of that evidence was admitted, the trial court instructed the jurors that they could not use the evidence "to decide whether [Ms. Bryson] carried out the acts involved in the crime charged" but that if they were convinced, beyond a reasonable doubt, by other evidence that Ms. Bryson had indeed carried out the acts involved in the crime charged, they could "use this evidence concerning previous [and, presumably, subsequent] acts to decide intent, knowledge, or common scheme or plan."  See Fed. R. Ev. 404(b).

Evidence of "other crimes, wrongs, or acts" by a defendant, see Fed. R. Ev. 404(b), is inadmissible only if its relevance is solely to the question of a defendant's "character or ... propensity to commit the crime charged."  United States v. Jones, 990 F.2d 1047, 1050 (8th Cir. 1993), cert. denied, 510 U.S. 1048 (1994).  Such evidence is admissible if it is "(1) relevant to a material issue; (2) proved by a preponderance of the evidence; (3) higher in probative value than in prejudicial effect; and (4) similar in kind and close in time to the crime charged."  United States v. Campbell, 937 F.2d 404, 406 (8th Cir. 1991).  We review a trial court's decision to admit such evidence for abuse of discretion.  See, e.g., United States v. Wiley, 29 F.3d 345, 350-51 (8th Cir. 1994), cert. denied, 115 S. Ct. 522 (1994).

We apply "a reasonableness standard, examining the facts and circumstances of each case," in deciding whether a previous

-15-

conviction is too remote in time to be admitted. <u>United States v. Burk</u>, 912 F.2d 225, 228 (8th Cir. 1990). We observe, however, that in other cases, our court has allowed the admission of prior convictions at least seven and thirteen years old. <u>See</u>, respectively, <u>id.</u> at 227-28 and <u>United States v. Burkett</u>, 821 F.2d 1306, 1308-10 (8th Cir. 1987) (both seven years), and <u>United States v. Engleman</u>, 648 F.2d 473, 478-80 (8th Cir. 1981) (thirteen years). We therefore do not think that Ms. Bryson's previous conviction was so remote in time as to render it automatically inadmissible.

Ms. Bryson was charged in this case with conspiracy to distribute, and to possess with the intent to distribute, more than one kilogram each of methamphetamine and heroin. We greet with some surprise, therefore, her contention that the introduction of a certified copy of her conviction for distributing methamphetamine had to be amplified by evidence of the exact acts involved in order to show that that conviction was "similar in kind," <u>see</u> Fed. R. Ev. 404(b), to the charge in this case. At the very least, the prior conviction was clearly relevant on the issues of knowledge and intent. <u>See</u>, <u>e.g.</u>, <u>United States v. Gadison</u>, 8 F.3d 186, 191-92 (5th Cir. 1993) (prior conviction for possession of cocaine; current charge of conspiracy to distribute cocaine base), and <u>United States v. Rubio-Estrada</u>, 857 F.2d 845, 847-49 (1st Cir. 1988) (prior conviction for possession with intent to distribute cocaine; current charge the same). We also believe that the trial court did not abuse its discretion in deciding that the probative value of the prior conviction outweighed its unfair prejudicial effect. We therefore hold that the trial court properly admitted the evidence of Ms. Bryson's 1987 conviction.

We see no evidence in the trial transcript that the drug residues found at the time of Ms. Bryson's second arrest were

analyzed and thus identified.  We therefore have reservations about the admission of the evidence of the apparent drug paraphernalia, those residues, and the marijuana also found at that time.  Nonetheless, we believe that even if the trial court erred in allowing that evidence to be admitted, the error was harmless.  That is because, in our view, its prejudicial effect was negligible compared to the overwhelming other evidence against Ms. Bryson.  We therefore decline to reverse her conviction because of the admission of the evidence that she challenges.  See, e.g., United States v. Betts, 16 F.3d 748, 760-61 (7th Cir. 1994), and United States v. Echeverri, 854 F.2d 638, 645-48 (3d Cir. 1988).

V.

At sentencing, the trial court increased by three levels Ms. Bryson's base offense level under the federal guidelines to reflect that Ms. Bryson was a manager or supervisor in a criminal activity that involved five or more participants or was otherwise extensive.  See U.S.S.G. § 3B1.1(b). The trial court stated only, however, that the evidence "that was adduced indicates that Ms. Bryson was in fact the main person in St. Louis and had several  people working under her, received large quantities of drugs, and I believe all of that is ample to support a three level enhancement." Ms. Bryson argues that the trial court's finding that she was a manager or supervisor is clearly erroneous (she does not challenge the size or scope of the conspiracy).  See, e.g., United States v. Skorniak, 59 F.3d 750, 757 (8th Cir. 1995), cert. denied, 116 S. Ct. 487 (1995).

The adjustments available under § 3B1.1 are meant to differentiate among defendants according to their relative responsibility.  See U.S.S.G. § 3B1.1, background.  In deciding whether a defendant was a manager or supervisor, see U.S.S.G.

-17-

§ B1.1, application note 2, the court should consider the defendant's exercise of decision-making authority, the nature of the defendant's participation in the crime, the defendant's recruitment (if any) of accomplices, the defendant's claim (if any) to more of the fruits of the crime, the degree of the defendant's participation in planning or organizing the offense, the nature and scope of the crime, and the degree of control and authority that the defendant exercised over others. See U.S.S.G. § B1.1, application note 4.

The evidence at trial (no additional evidence was presented at sentencing) was that Ms. Bryson was sent at least nine packages, under various names and at least three different addresses, from Henrietta Furnish (a co-defendant), a person who Ms. Bryson described to a DEA agent as having supplied her with methamphetamine in one-pound quantities "for a period of time." Ms. Bryson also told the DEA agent that she and Robert Avila (a
co-defendant who pleaded guilty and testified for the government) would "work in conjunction" to get methamphetamine from Ms. Furnish (evidently Mr. Avila acted as a middleman in placing the order and collecting the money). At one point, Ms. Bryson asked Mr. Avila if he also could supply her with methamphetamine. Ms. Bryson told both the DEA agent and Mr. Avila that she sold the methamphetamine when she received it.

It is true that Ms. Bryson was receiving such large amounts of methamphetamine that an intent to distribute could easily be inferred. There is no evidence in the record, however, about sales by Ms. Bryson to subordinate dealers or, indeed, to anyone other than a government informant. The Seventh Circuit has held that status "as a distributor, standing alone, does not warrant an enhancement under § 3B1.1," United States v. Brown, 944 F.2d 1377,

1381 (7th Cir. 1991), and we agree with that view.  We note that there is no evidence in the record that Ms. Bryson had "a greater degree of responsibility [than any of the co-defendants to whom she was linked by the evidence] for putting together the drug operation or a particular deal." United States v. Vargas, 16 F.3d 155, 160 (7th Cir. 1994).  Ms. Bryson's status as a mid-level distributor is already reflected in her base offense level, a figure based on the amount of drugs she was responsible for distributing.  See, e.g., United States v. Brown, 944 F.2d at 1385.  In these circumstances, we agree with the Seventh Circuit that without "additional evidence that demonstrated [that she] exercised a leadership role in the offense," an enhancement under § 3B1.1 is inappropriate.  Id. (emphasis in original).

There were six defendants in these cases, and during the two trials, testimony was offered about many drug deals and many individuals.  We believe that in remembering the evidence, the trial court may have inadvertently conflated some of it.  With respect to Ms. Bryson, we cannot find sufficient evidence to affirm the three-level enhancement under § 3B1.1.  We therefore remand her case for resentencing in light of this opinion.

VI.

Ronnie and Henrietta Furnish, who are husband and wife, challenge the sufficiency of the evidence for their convictions.  Mr. Furnish contends specifically that there is no evidence directly linking him to the alleged conspiracy as a participant and that mere knowledge of the alleged conspiracy is not enough to sustain his conviction.  Ms. Furnish contends that there is no evidence that she ever belonged to a conspiracy to distribute both methamphetamine and heroin, as opposed to methamphetamine only (which she concedes).  We review the evidence in the light most

favorable to the government.  See, e.g., United States v. Jenkins, 78 F.3d 1283, 1287 (8th Cir. 1996).  We turn first to Mr. Furnish.

During a search of the Furnishes' residence in 1994, law enforcement officers found a loaded pistol and extra bullets in the master bedroom, with a note from Mr. Furnish indicating that he had loaded and cocked the weapon (presumably to protect the methamphetamine-associated manufacturing apparatus found in the attic above the closet in that bedroom).  There was also evidence that Mr. Furnish often used the name "Greg Hildebrand" and received, in that name and in his own name, at least $5,000 from Paul Logan (a co-defendant whose case we do not address here) in 1992-1993 and at least $100 from Linda Bryson (a co-defendant) in 1995.

Evidence of loaded firearms, particularly in close proximity to drug-related items (such as equipment for drug manufacture), is probative of intent to distribute.  See, e.g., United States v. Meirovitz, 918 F.2d 1376, 1379-80 (8th Cir. 1990), cert. denied, 502 U.S. 829 (1991).  An extremely close personal connection to a location that contains drug-related items (such as equipment for drug manufacture) is probative of both conspiracy to manufacture drugs and conspiracy to distribute.  See, e.g., United States v. Rogers, 939 F.2d 591, 595 (8th Cir. 1991) (per curiam), cert. denied, 502 U.S. 991 (1991), and United States v. Perlaza, 818 F.2d 1354, 1359 (7th Cir. 1987), cert. denied, 484 U.S. 861 (1987).  The repeated use of an alias is probative of consciousness of guilt.  See, e.g., United States v. Valencia-Lucena, 925 F.2d 506, 513 (1st Cir. 1991), and United States v. Eggleton, 799 F.2d 378, 381 (8th Cir. 1986).  Finally, evidence of money transfers between a defendant and co-defendants is probative of involvement in a drug-related conspiracy.  See, e.g., United States v. Singer, 970 F.2d

1414, 1419 (5th Cir. 1992), and <u>United States v. Delgado</u>, 914 F.2d 1062, 1066 (8th Cir. 1990).  We therefore believe that although the evidence against Mr. Furnish is not extensive, it is nonetheless, in combination, legally sufficient.

It is clear from the trial transcript that Robert Avila (a co-defendant who pleaded guilty and testified for the government) and Rodrigo Rodriguez (a co-defendant whose case we do not address here) were the primary actors in the heroin distribution that occurred in this case.  The evidence also showed, however, that Ms. Furnish knew that Mr. Avila had a source for heroin and  that she asked him on at least one occasion, and possibly more (the testimony was unclear), to send some heroin to a third person.

Ms. Furnish and Mr. Avila worked closely together to supply methamphetamine to others.  It would not have been unreasonable for the jurors to conclude that Ms. Furnish and Mr. Avila had the common goal of sending illegal drugs from California to Missouri, with Ms. Furnish's primary responsibility being the methamphetamine and Mr. Avila's primary responsibility being the heroin.  Indeed, there was some evidence to suggest that they may have had at least one customer in common for both drugs -- Steven Glaus (a co-defendant whose case we do not address here) -- who may have served as a mid-level distributor for both drugs.  Although the issue is a close one, we hold that the totality of the evidence supports a conclusion that the conspiracy was a single one to distribute both methamphetamine and heroin and that Ms. Furnish was a knowing participant in that conspiracy with respect to both drugs.  We therefore affirm her conviction.

We caution the government, however, that it may be "unnecessarily exposing itself to reversal," <u>United States v. </u>

Sperling, 506 F.2d 1323, 1340 (2d Cir. 1974), cert. denied, 420 U.S. 962 (1975), 421 U.S. 949 (1975), by combining the charges against ten defendants into one case under the claim of a single conspiracy "when the criminal acts could be more reasonably regarded as two or more conspiracies, perhaps with a link at the top," id. at 1341. In our view, the link between Ms. Furnish and the conspiracy to distribute heroin is just about as thin as it can be and still be legally sufficient.

## VII.

Finally, Mr. Furnish challenges the trial court's application to him of a four-level increase of his base offense level under the federal sentencing guidelines to reflect that Mr. Furnish was an organizer or leader in a criminal activity that involved five or more participants or was otherwise extensive. See U.S.S.G. § 3B1.1(a). At sentencing, the trial court made no specific findings but merely "overruled" Mr. Furnish's objection to the four-level increase. Mr. Furnish argues that the trial court's finding that he was an organizer or leader is clearly erroneous (he does not challenge the size or scope of the conspiracy). See, e.g., United States v. Maxwell, 25 F.3d 1389, 1399 (8th Cir. 1994), cert. denied, 115 S. Ct. 610 (1994).

As noted above, in determining whether this adjustment is appropriate, a trial court should consider how much decision-making authority the defendant had, the nature of the defendant's participation in the crime, whether the defendant recruited accomplices, the defendant's assertion of a right to greater profits from the crime, the defendant's degree of participation in planning or organizing the offense, the nature and scope of the crime, and the degree of the defendant's control and authority over others. See U.S.S.G. § 3B1.1, application note 4.

In our view, the evidence against Mr. Furnish shows nothing resembling the type of control over "one or more other participants," <u>see</u> U.S.S.G. § 3B1.1, application note 2, that is necessary to support an enhancement for being a leader or organizer in the absence of other evidence of leadership or organization. It is true that Mr. Furnish apparently had a buyer/seller relationship with Paul Logan (a co-defendant whose case we do not address here) and possibly Linda Bryson (a co-defendant), and may even have "fronted" methamphetamine to them (although the evidence is not clear on that point). There was no evidence, however, that Mr. Furnish "regularly made decisions as to when [drugs] should be transported, hired the [transporters], ... recruited distributors, ... or directed the activity of [any] subordinate." <u>United States v. Richards</u>, 784 F. Supp. 1373, 1384 (N.D. Ind. 1992), <u>aff'd</u>, 997 F.2d 248 (7th Cir. 1993). In these circumstances, we agree with the courts that have held that without such additional evidence, an enhancement for being a leader or organizer under § 3B1.1(a) is not appropriate. <u>See</u>, <u>e.g.</u>, <u>United States v. Guyton</u>, 36 F.3d 655, 662 (7th Cir. 1994); <u>see</u> <u>also</u> <u>United States v. Maxwell</u>, 34 F.3d 1006, 1012 (11th Cir. 1994), and <u>United States v. Yates</u>, 990 F.2d 1179, 1182 (11th Cir. 1993) (<u>per</u> <u>curiam</u>). We therefore remand Mr. Furnish's case for resentencing in light of this opinion.

## VIII.

For the reasons stated, we affirm the convictions of Linda Bryson, Ronnie Furnish, and Henrietta Furnish. We remand for resentencing the cases of Ms. Bryson and Mr. Furnish.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.