# United States Court of Appeals
## For the First Circuit

No. 18-1478

UNITED STATES,

Appellee,

v.

CAREY ACKIES, a/k/a Boyd,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Lynch, Selya, and Boudin,
Circuit Judges.

Jonathan I. Edelstein, with whom Edelstein & Grossman was on brief, for appellant.
Renée M. Bunker, Assistant United States Attorney, Appellate Chief, with whom Halsey B. Frank, United States Attorney, was on brief, for appellee.

March 13, 2019

**LYNCH**, **Circuit Judge**.  A jury found Carey Ackies guilty of two counts of conspiracy to possess and possession with intent to distribute heroin and cocaine base.  Though Ackies resided in New York, he distributed the drugs through his network up to Maine, where many of the key facts take place.  He was sentenced to 230 months' imprisonment.

His appeal challenges: denials of motions to suppress two warrants obtained by law enforcement and evidence obtained from his warrantless arrest, evidence rulings at his trial, and his sentence.

In affirming, we reject his arguments that there was error in the issuance of precise location information warrants ("PLI warrants") by a magistrate judge in Maine on a finding of probable cause, which allowed monitoring of the locations of Ackies's two cell phones.  We hold that the PLI warrants were properly issued under the Stored Communications Act (SCA), 18 U.S.C. §§ 2701 et seq.  Our holding on this issue is like those of the Seventh and Third Circuits.  United States v. Berkos, 543 F.3d 392, 396-98 (7th Cir. 2008); United States v. Bansal, 663 F.3d 634, 662 (3d Cir. 2011).

We reject the argument that the cell phones were tracking devices under 18 U.S.C. § 3117, and that the PLI warrants violated Rule 41(b) of the Federal Rules of Criminal Procedure.  We also hold, in accord with our decision in United States v. Levin, 874

- 2 -

F.3d 316 (1st Cir. 2017), and the views of four other circuits, that the good-faith exception to suppression could apply in any event. We also approve the use of rebuttal testimony from a Pretrial Services Officer to impeach a witness.

I.

To set up the background for the legal issues, we summarize the investigation and procedural history briefly in this section. Additional facts and statutory background are provided later where necessary. Law enforcement began investigating Ackies in the fall of 2015, beginning with information from a cooperating witness who became a cooperating defendant ("CD1") concerning his drug trafficking with a man he knew then as "Boyd" (determined at trial to be Ackies). In January 2016, the government applied for and received PLI warrants from a magistrate judge in Maine pursuant to a provision of the SCA, 18 U.S.C. § 2703, and Fed. R. Crim. P. 41 ("Rule 41") for two cell phones, Target Telephone 1 ("TT1") and Target Telephone 2 ("TT2"). This led to other confirming information. Ackies was arrested in January 2016 and charged in February 2016 with violations of 21 U.S.C. §§ 846 and 841(a)(1), conspiracy to possess and possession with intent to distribute heroin and cocaine base.

A.    Suppression Motions after the Investigation and Arrest

Ackies filed six pretrial motions in March 2017, in part to suppress evidence obtained from the issuance of the two PLI

warrants and pursuant to his warrantless arrest. He alleged that both warrants were void and that one lacked probable cause.

At a two-day evidentiary hearing, the court credited the testimony of Maine State Police Sergeant Thomas Pappas, who testified that in the fall of 2015, he received information from CD1 (then under indictment for drug trafficking offenses), that CD1 had been dealing and transporting cocaine base, oxycodone, and heroin obtained from a source CD1 knew as "Boyd" in New York City. CD1 provided a cell phone number (TT1) that belonged to "Boyd," and identified "Boyd's" vehicles. CD1 told Pappas that he had exchanged drugs for cash at a bus terminal in Portland, Maine and had met "Boyd" on several occasions.

Pappas then obtained a warrant for TT1 under 18 U.S.C. § 2703(c)(1)(A) and Rule 41 based on his affidavit recounting this information. The January 15, 2016, PLI warrant directed AT&T to provide "specific latitude and longitude or other precise location information" for TT1 for thirty days; AT&T did so. The information showed that TT1 was in a building on 154th Street in Jamaica, New York on January 17 and 18, 2016.[1] Also on January 18, Pappas intercepted incoming calls and text messages on CD1's phone from

---

[1] At the evidentiary hearing, Schamia Taylor -- Ackies's former romantic partner -- testified that she was living in the 154th Street apartment but Ackies was not, and that she had told officers that Ackies did not live there. Ackies testified that he had told officers he had no authority to consent to a search of that apartment.

a number that would later be surveilled as TT2. Pappas recognized "the same voice of the incoming caller [as on TT1] telling [CD1] to get ready and that he would be there at 8:00." Pappas confirmed that a bus from Boston was due in Portland at 8:00 a.m. and told CD1 to meet agents there. CD1 recognized one of bus passengers as "Mike," a "runner" for and associate of "Boyd's" whom CD1 had met. Agents arrested "Mike" (who became Cooperating Defendant 2, "CD2") and seized about 100 grams of cocaine base and forty grams of heroin from him.

CD2 then cooperated with Pappas, including by providing information about "Boyd's" residence and vehicles. After Pappas passed this information to Drug Enforcement Administration (DEA) agents in New York, the agents established surveillance near 107-41 154th Street and identified Ackies, a potential suspect (though they did not see Ackies enter or leave this address). The DEA agents sent a booking photograph of Ackies to Pappas, and he showed the picture to CD1 and CD2. CD2 identified Ackies, the individual in the photo, as CD2's source for the heroin and cocaine base. CD1 "said that picture looked meaner than . . . Boyd in person" but did not say that the picture was not of the person he knew as "Boyd."

On January 19, 2016, Pappas and other agents conducted surveillance at 107-41 154th Street. Pappas observed a Nissan

Quest van that was registered to "Tyree Ackies." CD2 had told Pappas that Ackies owned a Nissan Quest.

On January 20, 2016, DEA Task Force Officer Brian Nappi obtained a PLI warrant for TT2 under SCA § 2703(c)(1)(A) and Rule 41. Nappi's application stated that CD1 had notified "Boyd" on January 19 that CD1 would be driving to New York the next day. The precise location information obtained for TT2 placed TT2's location in the same area as the 154th Street location where TT1 had been located earlier. Precise location information from the evening of January 20 showed TT2 "moving down Liberty Avenue," and government agents followed its location to a parking lot, observed the Nissan Quest van, and arrested Ackies. Ackies was questioned after his arrest and, according to Pappas, stated that he lived at 107-41 154th Street, Jamaica, New York with Taylor, their children, and his nephew.

B.  Denial of Motions to Suppress

In an order issued on July 26, 2017, the district court denied the three now-appealed motions to suppress, finding:

(1)  There was adequate probable cause for the PLI warrant for TT1, even though "the bulk of the information supporting probable cause came from an informant, CD1, who had at times misled the Government," and even without probable cause, the good-faith exception to the exclusionary rule discussed in United States v. Leon, 468 U.S. 897, 899 (1984), would apply, United States v. Ackies, No. 2:16-CR-20-GZS, 2017 WL 3184178, at *7-*8 (D. Me. July 26, 2017);

(2)  The two PLI warrants were properly issued under 18 U.S.C. § 2703 rather than the "tracking device" provision at § 3117,

and assuming arguendo a violation of Rule 41(b)'s geographic limitations had occurred, the good-faith exception applied, id. at *8-*14;

(3) Ackies's warrantless arrest was supported by probable cause, id. at *14.

The case proceeded to trial, and conviction.

C.    Trial

Trial began on November 27, 2017, and lasted four days. Much of the testimony was similar to that at the suppression hearings, though the prosecution expanded on several aspects, including explaining the role of Ackies's nephew (Christopher Sampson) and an unnamed "fat guy" involved in the drug distribution.    In short, the prosecution presented a case that: "Boyd" was Ackies and Ackies was a speaker on recorded phone calls with CD1 and was the person who had met and directed CD1, CD2, and others in drug trafficking and distribution; and Ackies lived at the 154th Street apartment where surveillance had led to his arrest.    At trial, both CD1 and CD2 testified and identified Ackies in court and both identified a voice on the calls as belonging to Ackies.[2]

The defense argued that Ackies was not "Boyd" and so was not the person on TT1 communicating with CD1, nor the person who had met and directed CD1 and CD2, and that he did not live at the

---

[2]    Both CD1 and CD2 testified pursuant to cooperation and plea agreements with the government.

- 7 -

154th Street apartment. Schamia Taylor and Celia Lopez, the mother of one of Ackies's children, testified on his behalf. Taylor testified, as at the suppression hearing, that she was living in the 154th Street apartment but Ackies was not; Lopez testified that she had a romantic relationship with Ackies, he lived with her from 2015 to the date of his arrest, and she had never seen him enter Taylor's residence.

At trial, the district court allowed the jury to have transcripts of several recorded calls as demonstrative aids and, based on the identification testimony, allowed to stand the identification in these transcripts of a speaker as "Ackies." Ackies objected to the use of his name in the transcripts. After the close of the defense's case, the government was allowed to provide rebuttal testimony by a Pretrial Services Officer regarding statements made by Taylor to him. Ackies challenged this. The district court allowed the testimony as proper rebuttal. The jury found Ackies guilty as charged on both counts.

D.   Sentencing

We describe only the facts from sentencing pertinent to this appeal. The revised presentence investigation report ("PSR") stated a Base Offense Level ("BOL") of thirty due to a drug quantity of 2155.97 kilograms of marijuana equivalency and, among other enhancements, a four-level "aggravating role" enhancement pursuant to U.S.S.G. § 3B1.1(a).

Ackies objected to portions of the PSR, including the drug quantity calculation and the "aggravating role" enhancement. The district court determined that the PSR's estimate of drug quantity and its "aggravating role" enhancement should be accepted. The district court then imposed concurrent sentences of 230 months' imprisonment on each count, down from the guideline sentencing range of 292 to 365 months' imprisonment. This appeal followed.

## II.

A.    Challenge to the Denial of Three Suppression Motions

In reviewing the denial of a suppression motion, we assess the district court's factfinding for clear error, and review legal questions (such as probable cause and reasonable suspicion) de novo. See, e.g., United States v. Gates, 709 F.3d 58, 61–62 (1st Cir. 2013). We "may affirm [the] suppression rulings on any basis apparent in the record." United States v. Arnott, 758 F.3d 40, 43 (1st Cir. 2014).[3]

---

[3]    We do not consider the government's argument that Ackies lacks what it terms "standing" to challenge the PLI warrant for TT1 (because he denied ownership of the phone and so lacked a reasonable expectation of privacy in its location); the government concedes that it did not raise this argument to the district court. See, e.g., United States v. Almonte-Báez, 857 F.3d 27, 33 n.5 (1st Cir. 2017) ("If any principle is settled in this circuit, it is that, absent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal." (quoting Teamsters, Chauffeurs, Warehousemen & Helpers Union v. Superline Transp. Co., 953 F.2d 17, 21 (1st Cir. 1992))).

1. <u>Issuance of the PLI Warrants</u>

Ackies argues that the PLI warrants for TT1 and TT2 were "jurisdictionally void on two grounds": that a cell phone used to track a person's movements is a "tracking device" under 18 U.S.C. § 3117 (the section addressing the issuance of warrants and orders for the installations of mobile tracking devices), and that geographic, jurisdictional limitations in Rule 41(b) barred the Maine magistrate judge from issuing the PLI warrants for phones located outside Maine. He also argues that the warrant for TT1 was not supported by probable cause. These arguments fail.

a. <u>Applicability of the Stored Communications Act</u>

The two PLI warrants here were issued pursuant to provisions in the SCA, specifically 18 U.S.C. §§ 2703(a) and 2703(c)(1)(A), and Rule 41. Ackies argues that this was improper under <u>Carpenter</u> v. <u>United States</u>, 138 S. Ct. 2206 (2018). He incorrectly reads <u>Carpenter</u> and argues it holds that "a cell phone constitutes a 'tracking device' . . . when it is used to obtain precise location information regarding a suspect." So, he argues, such a warrant must be issued under 18 U.S.C. § 3117 ("Mobile tracking devices") to be valid.

In <u>Carpenter</u>, the Supreme Court held that "acquisition of . . . cell-site records . . . was a search under [the Fourth] Amendment," <u>Carpenter</u>, 138 S. Ct. at 2223, and that "[w]hether the Government employs its own surveillance technology . . . or

- 10 -

leverages the technology of a wireless carrier, . . . an individual maintains a legitimate expectation of privacy in the record of his physical movements." Id. at 2217. The government does not argue otherwise here. Carpenter mentions the term "tracking device" only once -- referring to a traditional GPS tracking device installed on a vehicle. Id. at 2215. Section 3117, concerning tracking devices, is never mentioned in the opinion. See generally id. The Supreme Court's general analogy of historical "cell phone location information" to "GPS monitoring" is not a holding that a cell phone is a "tracking device" under an unmentioned statute. Id. at 2215-16.[4]

Further, Ackies is wrong in attacking the district court's determination regarding warrants by citing to Carpenter's statement that "an order issued under § 2703(d) of the Act is not a permissible mechanism for accessing historical cell-site records." Id. at 2221 (emphasis added). Section 2703 treats warrants and orders differently. See 18 U.S.C. § 2703. Here, the warrants were issued under § 2703.

---

[4]    Section 3117 allows a court to "authorize the use of that [tracking] device within the jurisdiction of the court, and outside that jurisdiction if the device is installed in that jurisdiction." 18 U.S.C. § 3117(a). Section 2703 requires a court seeking information from a "provider of electronic communication service or remote computing service" to "obtain[] a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction." Id. § 2703(c)(1).

Apart from Carpenter, Ackies attempts to argue from the definition of a "tracking device" in § 3117, which provides:

> (a) In General. – If a court is empowered to issue a warrant or other order for the installation of a mobile tracking device, such order may authorize the use of that device within the jurisdiction of the court, and outside that jurisdiction if the device is installed in that jurisdiction.

> (b) Definition. – As used in this section, the term "tracking device" means an electronic or mechanical device which permits the tracking of the movement of a person or object.

18 U.S.C. § 3117. Ackies argues that a cell phone used for obtaining precise location information is "an electronic or mechanical device which permits the tracking of the movement of a person or object" under § 3117.[5] Id. § 3117(b).

But under the text of § 3117, a cell phone used for obtaining precise location information does not fit within the definition of a "tracking device." Section 3117(a) refers to the "installation of a mobile tracking device." Id. § 3117(a) (emphasis added). By their plain meanings, "installation" and

---

[5] Ackies also argues that software was involved in the execution of the PLI warrants, and since software "must be installed . . . , a reference to 'installation' does not limit the reach of Section 3117 to hardware." This argument ignores the term "device" in the definition; software is not a "device" under its plain meaning. See Webster's Third New International Dictionary 618 (1993) (defining "device," in one usage, as "a piece of equipment or a mechanism designed to serve a special purpose or perform a special function").

- 12 -

"device" refer to the physical placement of some hardware or equipment (such as the GPS device installed on a car mentioned in Carpenter).  See, e.g., In re Application of the U.S. for an Order for Authorization to obtain Location Data Concerning an AT & T Cellular Tel., 102 F. Supp. 3d 884, 892 (N.D. Miss. 2015) (determining that "the 'installation' language in the Tracking Device Statute constitutes a real reason for not utilizing that statute for requests for prospective cell phone location data"); In re Smartphone Geolocation Data Application, 977 F. Supp. 2d 129, 150 (E.D.N.Y. 2013) ("[G]athering geolocation information about a cellular telephone does not convert the phone into a 'tracking device' for the purpose of [§ 3117].").[6]  A reading of § 3117(b) which includes cell phones as "tracking device[s]" ignores the relevant textual context in § 3117(a).[7]

---

[6]     Some district courts have broadly read "tracking device" to include a cell phone.  See, e.g., In re Application of U.S. for an Order Authorizing Disclosure of Location Info. of a Specified Wireless Tel., 849 F. Supp. 2d 526, 537 (D. Md. 2011); In re Application for Pen Register & Trap/Trace Device with Cell Site Location Auth., 396 F. Supp. 2d 747, 754 (S.D. Tex. 2005); In re Application of the U.S. for an Order (1) Authorizing the Use of a Pen Register & a Trap & Trace Device, 396 F. Supp. 2d 294, 311 (E.D.N.Y. 2005).  These cases are not persuasive.

[7]     Several circuits have assumed, without holding, that the SCA properly applies to information gathered about the "real-time location of [a] mobile device."  United States v. McHenry, 849 F.3d 699, 702 n.2 (8th Cir. 2017); see also United States v. Banks, 884 F.3d 998, 1010 (10th Cir. 2018) (noting that an order under the SCA "required T-Mobile to disclose . . . real-time [cell-site location information] and to determine, in real time, the location of [a] cell phone").  Another circuit has rejected the determination that cell-site location information "by definition

- 13 -

Further, as the district court correctly stated, use of § 3117 does not work when considering cell phone location data, because "it could be exceedingly difficult in situations involving PLI to determine where 'installation' is to occur," and the government "may be seeking data concerning a cell phone whose present location is unknown." Ackies, 2017 WL 3184178, at *11.

Our understanding of a "tracking device" is also supported by Rule 41, addressing searches and seizures, and the relevant Advisory Committee Notes.[8]  Rule 41(e)(2)(c), titled "Warrant for a Tracking Device," requires in part that such a warrant "command the officer to: (i) complete any installation authorized by the warrant within a specified time no longer than 10 days; [and] (ii) perform any installation authorized by the warrant during the daytime."  Fed. R. Crim. P. 41(e)(2)(c) (emphasis added).[9]  The Advisory Committee Notes for the 2006 Amendments to the Rules state that a "magistrate judge's authority

---

should be considered information from a tracking device." In re Application of U.S. for an Order Directing a Provider of Elec. Commc'n Serv. to Disclose Records to Gov't, 620 F.3d 304, 313 (3d Cir. 2010).

[8]  "In the absence of a clear legislative mandate, the Advisory Committee Notes provide a reliable source of insight into the meaning of a rule."  United States v. Vonn, 535 U.S. 55, 64 n.6 (2002).

[9]  As to Ackies's software argument, supra, the "daytime" requirement would make no sense for software installation rather than the installation of a physical device.

- 14 -

under [the tracking device warrant] rule includes the authority to permit . . . installation of the tracking device, and maintenance and removal of the device." Advisory Committee's Notes on 2006 Amendments to Fed. R. Crim. P. 41 (emphasis added). There is no "maintenance" or "removal" of a "device" when gathering precise location information from a cell phone.

In addition, the 2006 Advisory Committee Notes differentiate § 3117 from the SCA, stating that the "[u]se of a tracking device is to be distinguished from other continuous monitoring or observations that are governed by statutory provisions or caselaw. See Title III, Omnibus Crime Control and Safe Streets Act of 1968, as amended by Title I of the 1986 Electronic Communications Privacy Act [ECPA]." Id. The SCA is part of the ECPA. See, e.g., United States v. Graham, 824 F.3d 421, 437 (4th Cir. 2016) (en banc), abrogated on other grounds by Carpenter, 138 S.Ct. 2206.

The SCA was a proper basis for the PLI warrants issued here. Section 2703 of the SCA, in part, provides that:

> A governmental entity may require the disclosure by a provider of electronic communication service of the contents of a wire or electronic communication . . . only pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction.

18 U.S.C. § 2703(a). Section 2703(c)(1)(A) provides that:

- 15 -

> A governmental entity may require a provider of electronic communication service or remote computing service to disclose a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications) only when the governmental entity --
>> (A) obtains a warrant issued using the procedures described in the Federal Rules of Criminal Procedure (or, in the case of a State court, issued using State warrant procedures . . . ) by a court of competent jurisdiction[.]

Id. § 2703(c)(1)(A). "[A] 'court of competent jurisdiction' includes any district court of the United States (including a magistrate judge of such a court) that . . . has jurisdiction over the offense being investigated." Id. § 2711(3)(A)(i). The government properly requested warrants for TT1 and TT2 from a "court of competent jurisdiction," since the magistrate judge in the District of Maine had jurisdiction over the drug trafficking offenses being investigated. The government requested precise location information from the "provider of electronic communication service" and this precise location information "pertain[ed] to a subscriber to or customer of such service." Under § 2703, at least some of the Federal Rules of Criminal Procedure applied to these warrants: the Rules describing "procedures" for the issuance of a warrant.

So the next logical question is whether the geographic limitations in Rule 41(b) apply to warrants under the SCA.

- 16 -

b.   Application of Fed. R. Crim. P. 41(b)

Neither party disputes that at least a portion of Rule 41 must apply to a warrant issued under the SCA.  Ackies argues that, because a warrant under § 2703 must be "issued using the procedures described in the Federal Rules of Criminal Procedure," id. § 2703(a), Rule 41(b) applies and bars the issuance of a warrant for New York subscribers' phones by a Maine magistrate judge.  Ackies describes Rule 41(b) as jurisdictional.

The government counters that Rule 41(b) does not apply to warrants under § 2703.  As in place in January 2016, when the warrants were issued, Rule 41(b) stated in relevant part:

> (b) Authority to Issue a Warrant. At the request of a federal law enforcement officer or an attorney for the government:
> (1)  a magistrate judge with authority in the district -- or if none is reasonably available, a judge of a state court of record in the district -- has authority to issue a warrant to search for and seize a person or property located within the district . . . .

Fed. R. Crim. P. 41(b)(1) (2015).  Then-Rule 41(b) provided several exceptions to this limitation, none of which are relevant here.[10]  See id. 41(b)(2)-(5) (2015).

---

[10]    An amendment on April 28, 2016, effective December 1, 2016, changed the caption of this subsection to "Venue for a Warrant Application" and added an exception directly addressing "remote access to search electronic storage media and to seize or copy electronically stored information."  Fed. R. Crim. P. 41(b)(6).

- 17 -

Rule 41(b) did not then and does not now apply to PLI warrants issued under SCA § 2703. The text of § 2703 compels this result. "[W]hen the statute's language is plain, the sole function of the courts -- at least where the disposition required by the text is not absurd -- is to enforce it according to its terms." Lamie v. U.S. Tr., 540 U.S. 526, 534 (2004) (quoting Hartford Underwriters Ins. Co. v. Union Planters Bank, N. A., 530 U.S. 1, 6 (2000)); see also Jam v. Int'l Fin. Corp., No. 17-1011, 2019 WL 938524 (S. Ct. Feb. 27, 2019), slip op. at 6 ("[A]bsent a clearly expressed legislative intention to the contrary . . . the legislative purpose is expressed by the ordinary meaning of the words used." (quoting Am. Tobacco Co. v. Patterson, 456 U.S. 63, 68 (1982))). Section 2703 only requires "using the procedures described in the Federal Rules of Criminal Procedure," not more. 18 U.S.C. § 2703(a) (emphasis added).

On this point, we agree with the Seventh Circuit that Rule 41(b) "discusses the circumstances as to when a court may issue a warrant, not the procedures to be used for issuing the warrant," Berkos, 543 F.3d at 398, and the Third Circuit's adoption of that view in Bansal. 663 F.3d at 662 (citing Berkos and rejecting the contention that Rule 41(b) "trumps § 2703(a)"). Further, we agree with the Seventh Circuit that

> Section 2703(a) refers only to the specific
> provisions of the Rules of Criminal Procedure
> . . . that detail the procedures for obtaining

- 18 -

and issuing warrants.  The word "procedure" is defined as "a specific method or course of action," Black's Law Dictionary, 1241 (8th ed. 2004), or "a particular way of accomplishing something or acting."  Merriam Webster's Collegiate Dictionary, 990 (11th ed. 2003). The common definition of "procedure" supports the conclusion that § 2703(a) incorporates only those provisions of Rule 41 that address the "specific method" or "particular way" to issue a warrant.

Berkos, 543 F.3d at 398.  Rule 41(b), again, does not address the specific method or particular way of issuing a warrant; it discusses venue and authority.[11]

Even were the text of the statute ambiguous (that is, even if "procedures described in the Federal Rules of Criminal Procedure," 18 U.S.C. § 2703(a), could refer to all of Rule 41 and not just its procedural portions), our holding that Rule 41(b) does not apply to § 2703 warrants is supported by statutory structure, legislative history, and congressional intent.  As to structure, § 2703(a) contains its own geographic, jurisdictional

_____

[11]    Section 2703(d), which addresses requirements for court orders under the SCA, does not mention the Federal Rules of Criminal Procedure; it mentions only issuance by "a court of competent jurisdiction."  18 U.S.C. § 2703(d).  If Rule 41(b) were applied to warrants issued under the SCA, that would mean that law enforcement would face a greater challenge in getting a warrant under a probable cause standard than in getting a court order based only on a showing that "specific and articulable facts" are "relevant and material to an ongoing criminal investigation."  Id. As the district court aptly stated, this would be "an absurd result that could well discourage the Government from seeking warrants as opposed to court orders."  Ackies, 2017 WL 3184178, at *12.

limitation: requiring issuance by "a court of competent jurisdiction," meaning, in part, one that has "jurisdiction over the offense." Id. § 2711. In addition, Rule 41(a) expressly states, in describing Rule 41's "[s]cope," that "[t]his rule does not modify any statute regulating search or seizure." Fed. R. Crim. P. 41(a)(1). Applying Rule 41(b) to a warrant issued under the SCA would "modify" § 2703(a)'s geographic, jurisdictional limitation.

As to the relevant legislative history and Congressional intent, Congress was clear that it intends to allow federal courts to permit searches under § 2703 beyond the courts' usual geographic jurisdictions. See, e.g., Hubbard v. MySpace, Inc., 788 F. Supp. 2d 319, 325 (S.D.N.Y. 2011). Section 2703(a) was amended in 2001 by the Uniting and Strengthening America by Providing Appropriate Tools to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act"). Pub. L. No. 107–56, § 220, 115 Stat. 272 (2001). Section 220 of the USA PATRIOT Act added to § 2703(a) the phrase, "by a court with jurisdiction over the offense under investigation." Id. The House Report explains this change:

> [Section] 2703(a) requires a search warrant to compel service providers to disclose unopened e-mails . . . . Currently, Federal Rules of Criminal Procedure 41 requires that the "warrant" be obtained "within the district" where the property is located. An investigator, for example, located in Boston who is investigating a suspected terrorist in that city, might have to seek a suspect's

electronic e-mail from an Internet service provide (ISP) account located in California. The investigator would then need to coordinate with agents, prosecutors and judges in the district in California where the ISP is located to obtain a warrant to search . . . . [The Act] amends § 2703 to authorize the court with jurisdiction over the investigation to issue the warrant directly.

H.R. Rep. No. 107-236, pt. 1, at 57 (2001). The House Report demonstrates the amendment's focus on clarifying (and, in some cases, expanding) the geographic scope of § 2703.

The district court correctly denied Ackies's motion to suppress evidence obtained from these warrants. Even assuming arguendo that the PLI warrants violated Rule 41(b), the good-faith exception from Leon, 468 U.S. 897, applies. We have determined so in the analogous context of a network investigative technique (NIT) warrant issued in violation of Rule 41(b), and that reasoning applies to SCA warrants here. Levin, 874 F.3d at 324. This view is in accord with recent cases from the Third, Eighth, Ninth, and Tenth Circuits, where these circuits have held that a Rule 41(b) violation does not prevent the application of the good-faith exception. See United States v. Henderson, 906 F.3d 1109, 1117 (9th Cir. 2018) ("Even though the Rule 41 violation was a fundamental, constitutional error, suppression of evidence obtained in violation of the Fourth Amendment is still not appropriate if, as it asserts, the government acted in good faith."); United States v. Werdene, 883 F.3d 204, 216 (3d Cir.

2018) (holding that "the good-faith exception applies to warrants that are void <u>ab initio</u>"), <u>cert. denied</u>, 139 S. Ct. 260 (2018); <u>United States</u> v. <u>Workman</u>, 863 F.3d 1313, 1318 (10th Cir. 2017) (holding that "the <u>Leon</u> exception applies even if the magistrate judge had exceeded [the Rule 41(b)] geographic constraints in issuing the warrant"), <u>cert. denied</u>, 138 S. Ct. 1546 (2018); <u>United States</u> v. <u>Horton</u>, 863 F.3d 1041, 1051 (8th Cir. 2017) (holding that "the <u>Leon</u> exception may apply to a warrant [that is] void <u>ab initio</u>" because of a Rule 41(b) violation), <u>cert. denied</u>, 138 S. Ct. 1440 (2018). The same reasoning from <u>Levin</u> applies to a PLI warrant issued in violation of Rule 41(b). We expressly extend <u>Levin</u> to PLI warrants under the SCA. We affirm the district court's holding on this point.

Considering the good-faith exception and the facts of this case, the executing officers acted "in objectively reasonable reliance" on the warrants. <u>Leon</u>, 468 U.S. at 922. There is no evidence that reliance on the warrants would amount to bad faith. See <u>Levin</u>, 874 F.3d at 322.

2. <u>Probable Cause for a PLI Warrant of Target Telephone 1</u>

Ackies argues that the denial of his motion to suppress the PLI warrant for TT1 was error because of a lack of probable cause. Ackies argues that the information relied upon by Sergeant Pappas for the PLI warrant came "almost entirely from" CD1, who was "simply not reliable" in important ways. Ackies further

- 22 -

argues that corroborating evidence, such as the finding of the TT1 phone number on CD1's phone and Pappas's "training and experience," do not suffice to provide probable cause.

There was ample probable cause even without any deference to the magistrate judges' determination.[12]  For probable cause for a warrant, based on the totality of the circumstances, Maryland v. Pringle, 540 U.S. 366, 372 n.2 (2003), "[t]he facts presented to the magistrate need only 'warrant a man of reasonable caution' to believe that evidence of a crime will be found," United States v. Dixon, 787 F.3d 55, 59 (1st Cir. 2015) (quoting United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999)).

In United States v. White, we

> identified a non-exhaustive list of factors to examine in deciding on an informant's reliability: (1) the probable veracity and basis of knowledge of the informant; (2) whether an informant's statements reflect first-hand knowledge; (3) whether some or all of the informant's factual statements were corroborated wherever reasonable and practicable; and (4) whether a law enforcement officer assessed, from his professional standpoint, experience, and expertise, the probable significance of the informant's information.

804 F.3d 132, 137 (1st Cir. 2015) (internal quotation marks omitted).[13]  CD1 had extensive personal experience with drug

---

[12]    "In a doubtful or marginal case, the court defers to the issuing magistrate's determination of probable cause."  United States v. Barnard, 299 F.3d 90, 93 (1st Cir. 2002).

[13]    Though Pappas's affidavit in support of a warrant did

dealing, including "multiple felony drug trafficking convictions."
CD1 had "provided information and cooperation in unrelated drug
trafficking investigations which ha[d] led to the seizure of
evidence . . . and multiple arrests or convictions."  In addition,
CD1's statements reflected first-hand knowledge.  CD1 provided
phone numbers for "Boyd."  He then provided text message exchanges
between his phone and TT1, as well as another number for "Boyd."
Pappas asserted that at least one such message (stating "1/1") was
drug-related.  Another text message from "Boyd" gave an address
("139-01 grand central pkwy jam ny 11435"), which CD1 said was the
location of a motel where he met with "Boyd."  In the presence of
Pappas, CD1 called "Boyd" and had a brief exchange.  Taken
together, these text messages and phone call at least partially
corroborated CD1's verbal account to Pappas.[14]  And Pappas
"reasonably assessed, based on his training and experience, that
the communications between CD1 and the user of TT1 concerned drug

---

not rely fully on CD1's testimony, it provided sufficient
information about CD1 to satisfy the standard for such a warrant:
"Where . . . the basis for the magistrate's probable cause finding
was information provided by an unnamed informant, the affidavit
must provide some information from which the magistrate can assess
the informant's credibility."  United States v. Greenburg, 410
F.3d 63, 67 (1st Cir. 2005).

[14]    The text messages and phone conversation between CD1 and
"Boyd" were coded or vague.  Pappas later testified on cross-
examination that the text messages detailed in the affidavit did
"add up" in his understanding, although he "partially" relied upon
CD1 for corroboration of what the messages meant.

trafficking."[15]  CD1 also told Pappas about a possible drug deal of 400 grams of heroin and 400 grams of heroin base.  That CD1, like many people, was not truthful on all occasions with Pappas amounts to nothing.

3.    Probable Cause for Ackies's Warrantless Arrest

Ackies argues that the fruits of his warrantless arrest in New York should have been suppressed because, in his view, the arrest was "undertaken without probable cause."  Ackies acknowledges that the police had substantial information at the time of his arrest, including "the information available at the time of the TT1 warrant . . . [,] additional recorded phone calls and the seizure of drugs from [CD2] at the Portland bus terminal." Ackies argues that the police also had "information that was inconsistent with [Ackies] being 'Boyd,'" and so "no reasonable officer would have cause to believe in good faith that Ackies was 'Boyd.'"

This argument fails.  For an arrest, "[p]robable cause exists if, at the time of the arrest, the collective knowledge of the officers involved was 'sufficient to warrant a prudent person

_____

[15]    Ackies is correct that "'training and experience' is not a mantra that an officer can intone in order to transform any innocuous conversation into instant probable cause," but is wrong that the conversations between CD1 and "Boyd" were not "nearly distinctive enough . . . to give probable cause that [there] was drug code" in the conversation.

in believing that the defendant had committed or was committing an offense.'"  United States v. Link, 238 F.3d 106, 109 (1st Cir. 2001) (quoting United States v. Bizier, 111 F.3d 214, 217 (1st Cir. 1997)).  The government had information included in the TT1 warrant application as well as the user of TT2's corroboration of a family relationship between CD2 and Ackies (confirming part of CD2's account to Pappas) and the fact that "real-time location information from TT2 . . . placed [Ackies] and the phone at the same location on January 22, 2016."  It does not defeat probable cause that government agents intermittently surveilled the targeted residence at 107-41 154th Street for about three days but did not see Ackies enter or exit.

The district court correctly held that the "lacunae in the information connecting [Ackies] to drug trafficking do[es] not negate the large amount of information pointing to a fair probability that he was engaged in that activity."  Ackies, 2017 WL 3184178, at *14.  A reasonable officer clearly could have had cause to believe that Ackies was "Boyd" and that Ackies was engaged in drug trafficking.  There was probable cause for the warrantless arrest.

B.  Rulings at Trial

1.  Allowance of Call Transcripts as Demonstrative Aids

Our standard of review for evidentiary rulings is, in general, deferential and for abuse of discretion.  See, e.g.,

United States v. Burgos-Montes, 786 F.3d 92, 114 (1st Cir. 2015).

Ackies argues that "absent a stipulation as to [his] identity, his name should have been removed from the transcripts [of recorded calls] before they were shown to the jury," and failure to do so was "prejudicial, incurable error requiring a new trial."

Here, the district court's allowance of the transcripts was within its discretion.[16] At the first use, the district court instructed the jury in part that "the transcript is being given to assist you in listening to the call[s]. It's the tape recording and not the transcript that is the evidence in this case." When other transcripts of recorded calls were used as demonstrative aids, the district court reminded the jury to follow the "same instruction."

As in Government of Virgin Islands v. Martinez, 847 F.2d 125 (3d Cir. 1988), the "government . . . introduced sufficient evidence to justify the use of the designation [that is, the name]

---

[16]    Ackies is correct that some circuits have preferred that transcripts be "stipulated to be accurate" when used as an "aid in listening." United States v. Bryant, 480 F.2d 785, 791 (2d Cir. 1973); see also United States v. Smith, 537 F.2d 862, 863 (6th Cir. 1976) (per curiam) (agreeing with the Second Circuit but finding such an error harmless). It is not clear, however, that a "stipulation as to the accuracy of the transcript" refers to the names listed (as opposed to the contents of the conversation itself). See Bryant, 480 F.2d at 791.

In our view, a transcript is not allowed in error simply because the designations of parties on the transcript have not been stipulated to; the district court has discretion, and the proper approach will depend on the facts of the particular case.

in the transcript." Id. at 129 (citing United States v. Rengifo, 789 F.2d 975, 983-84 (1st Cir. 1986)). CD2 identified Ackies's voice on the calls, and CD2 had met Ackies multiple times. CD1 also identified Ackies's voice in the calls, and CD1 had met Ackies multiple times, talked to him on the phone, and spent hours with him in New York. Pappas recognized the voice on the call ("My opinion was that the person that I listened to on each individual phone call was in fact Mr. Ackies"). That was enough. Ackies was free to, and did argue to the jury, that the designation of his name was incorrect and that he was not "Boyd."

### 2. Government's Rebuttal Testimony

"Appellate courts traditionally afford trial courts a wide berth in respect to regulating the scope of rebuttal testimony. We review challenges to such rulings for abuse of discretion." United States v. Sebaggala, 256 F.3d 59, 66 (1st Cir. 2001) (citations omitted). The district court allowed rebuttal testimony from a Pretrial Services Officer impeaching a defense witness. Ackies argues that the district court abused its discretion in doing so.

Taylor testified for the defense that that she had banned Ackies from entering her apartment for about a year before his arrest in January 2016, that she did not allow Ackies to stay there, and that Ackies was not on the lease at her apartment. The prosecution sought to rebut this testimony by calling Pretrial

Services Officer Andrew Abbott. When Ackies objected, the district court responded:

> You put on evidence . . . that this wasn't
> [Ackies's] address and that he was never let
> in there and [Taylor] never allowed him to get
> permission to go in . . . . And then she's
> also testified there was no gun there and
> there w[ere] no drugs there, . . . it couldn't
> possibly have been there. So that's rebuttal
> . . . . I'm going to allow it.

Abbott then testified that, in a bail recommendation interview, Ackies had said that he lived at "107-41 154th Street, Apartment 2, Queens, New York" since September 2011 with Taylor and their seven children, and Ackies had provided a phone number for Taylor, which Abbott called and spoke with a person who identified herself as Taylor, who "confirmed that [Ackies] did in fact live at that address."

Considering factors drawn from United States v. Clotida, 892 F.2d 1098, 1107 (1st Cir. 1989), Ackies argues that, as a result of the rebuttal testimony, he faced "surprise" and "detriment."

Generally, "the order in which the parties present their evidence is totally within the discretion of the trial court." Id. "In determining whether the trial court has abused its discretion . . . , three factors must be considered: '(1) surprise to the defendant, (2) defendant's opportunity to meet the proof, and (3) detriment to the defendant because of the order in which

the evidence was introduced.'" Id. (quoting United States v. Luschen, 614 F.2d 1164, 1170 (8th Cir. 1980)). Abbott's evidence had been "provided earlier" to Ackies, so there was no surprise, and there was an opportunity to meet it, and there is no explanation of any detriment.

Confidential information obtained from Pretrial Services is "not admissible on the issue of guilt in a judicial criminal proceeding." 18 U.S.C. § 3153(c)(3). We adopt the position, as have several other circuits, that such information may be used for impeachment purposes. E.g. United States v. Griffith, 385 F.3d 124, 126 (2d Cir. 2004); United States v. Stevens, 935 F.2d 1380, 1393-97 (3d Cir. 1991); United States v. Wilson, 930 F.2d 616, 618-19 (8th Cir. 1991). This understanding follows from the best reading of the statute. Section 3153(c)(3) applies only to "the issue of guilt" and does not state, for example, that information from pretrial services can never be used in a criminal trial for another purpose.

C.    Sentencing Determinations

"[W]e review the sentencing court's 'interpretation and application of the sentencing guidelines de novo,' the court's 'factfinding for clear error,' and its 'judgment calls for abuse of discretion.'" United States v. Ortiz-Carrasco, 863 F.3d 1, 3 (1st Cir. 2017) (quoting United States v. Ruiz-Huertas, 792 F.3d 223, 226 (1st Cir. 2015)). "[T]he government bears the burden of

proving sentence-enhancing factors by a preponderance of the evidence."  United States v. Cates, 897 F.3d 349, 354 (1st Cir. 2018) (quoting United States v. Nuñez, 852 F.3d 141, 144 (1st Cir. 2017)).

Ackies challenges the adoption of two sentencing enhancements as procedurally unreasonable, one as to drug quantity and one as to the number of people involved in the criminal conspiracy.

1.  Drug Quantity

The district court correctly found ample support for the PSR's estimate of the drug quantity involved of 2155.97 kilograms of converted drug weight (also referred to as marijuana equivalency) from 395.4 grams of cocaine base, 342.0 grams of heroin, and 60 grams of oxycodone.  Section 2D1.1 of the Sentencing Guidelines provides for a BOL of thirty where the quantity is "[a]t least 1,000 KG but less than 3,000 KG of Converted Drug Weight." U.S.S.G. § 2D1.1.  The parties agreed at the sentencing hearing that reducing the drug quantity calculation by half would not change the BOL (that is, the amount would still be over a thousand kilograms of converted drug weight and so still result in a BOL of thirty).

Ackies argues for an amount far less than half of the PSR's calculation: either "a total marijuana equivalency of 436.5033 kilograms" and a corresponding BOL of twenty-six or a

more general reduction to a BOL of twenty-eight because, in his view, the evidence "preclude[s] any reliable finding that the marijuana equivalency was 1000 grams or more." Specifically, Ackies argues that there is no evidence concerning the "purity or dosage" of the oxycodone pills and that the five-trip estimate coupled with CD1's sixty-gram-per-trip estimate was "not reliable." Ackies says it is unreliable given the amount of heroin seized from CD2, testimony about the untrustworthiness of CD1's estimates of drug quantity, and CD1's self-interest in providing large estimates.

"[T]he sentencing court is not required to make drug quantity findings with exactitude but may rest its findings upon a 'reasoned estimate' of the amount of drugs a defendant has been responsible for over time." United States v. Doe, 741 F.3d 217, 236 (1st Cir. 2013) (internal alterations omitted) (quoting United States v. Bernier, 660 F.3d 543, 546 (1st Cir. 2011)). "When choosing between a number of plausible estimates of drug quantity . . . a court must err on the side of caution." United States v. Sklar, 920 F.2d 107, 113 (1st Cir. 1990) (alteration in original) (quoting United States v. Walton, 908 F.2d 1289, 1301 (6th Cir. 1990)). Here, the district court's determination was reasonable.

First, the district court reasonably could credit CD1's and CD2's accounts, regardless of whether the train and bus tickets admitted into evidence corresponded exactly with five trips. At

"the intersection between credibility and drug quantity determinations . . . , a sentencing court's discretion to make informed choices is wide." United States v. Platte, 577 F.3d 387, 393 n.4 (1st Cir. 2009). And the five-trip estimate did not consider any prior trips made by CD2 before Ackies and CD1 met in April 2015. As to Ackies's assertion that the seizure of 39.9 grams of heroin from CD2 means that CD1's estimate of sixty grams or more per trip was incorrect, Ackies stated in a recorded call that he planned to send 400 grams (CD1: "At least they didn't catch him with 400"; Ackies: "Yeah, [be]cause that's what I was going to send you"). This conversation reasonably supported CD1's credibility.

Second, as to the drug quantity in each oxycodone pill, from the $25 cost per pill, it was reasonable to infer that the pills contained greater than ten milligrams each (or, indeed, the thirty milligrams estimated by the PSR). See, e.g., Drug Enforcement Administration, "Oxycodone, Trade Names: Tylox, Percodan, OxyContin," March 2014, available at http://www.deadiversion.usdoj.gov/drug_chem_info/oxycodone/oxyco done.pdf ("According to reports from DEA field offices, oxycodone products sell at an average price of $1 per milligram.").[17]

---

[17] This 2014 publication by the DEA is not in the record, but demonstrates that an inference of thirty milligrams per pill was reasonable based on the price per pill.

The district court's "drug quantity finding was supported by a sensible (though not inevitable) view of the record and rested on permissible (though not inevitable) approximations." Platte, 577 F.3d at 394.

2.   Number of People Involved in the Conspiracy

"We review role-in-the-offense determinations, steeped in the facts of the case, for clear error." United States v. Martínez-Medina, 279 F.3d 105, 123 (1st Cir. 2002).

As did the PSR, the district court determined that Ackies's conspiracy involved at least five participants and that Ackies was an "organizer or leader," and so applied the "aggravating role" enhancement under U.S.S.G. § 3B1.1(a) ("If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels."). The PSR counted six: Ackies, CD1, CD2, two couriers, and the person who introduced CD1 to Ackies; the prosecution's sentencing memorandum counted "at least" seven: Ackies, CD1, CD2, the two couriers (named in the memorandum as Ackies's nephew and the "overweight male"), and two other unnamed people as well.[18]

---

[18]   The government's sentencing memorandum does not count the person who introduced CD1 to Ackies; its brief to this court does.

Ackies challenges this enhancement only on the grounds that there were not five participants. He argues that CD1 cannot be counted because CD1 was a mere customer rather than a member of the conspiracy. In Ackies's view, this brings the number down to four.

The government produced evidence that Ackies controlled and directed CD1 in multiple ways, including where to meet and how much and what type(s) of drugs would be delivered ("It was pretty much whatever [Ackies] wanted"). Ackies also allowed CD1 to pay for the drugs by credit. CD1 did not describe himself, in his testimony, as a mere customer; instead, he described meeting drug couriers, purchasing large quantities of drugs, and his own drug sales.[19]

As stated in United States v. Ortiz-Islas, the defendant "had more than a mere buyer-seller relationship with" another person because the defendant "was engaging in selling wholesale quantities obviously purchased for further sale, and . . . was even willing to front cocaine to [the other person], an act of trust that assumed an ongoing enterprise with a standing objective." 829 F.3d 19, 25 (1st Cir. 2016).[20]

_____

[19] CD1 testified that, though the amounts and types of drugs delivered varied, he typically received "60 to 200 grams or more" of cocaine base per delivery, and "60 grams to . . . a couple hundred grams" of heroin per delivery, and "around 1,000 pills [of Oxycodone]" per delivery.

[20] Because of these facts, Ackies's citation to United

- 35 -

Sufficient evidence supported counting at least Ackies, CD1, CD2, Ackies's nephew, and the unnamed "overweight male"/"fat guy" as part of the conspiracy, which is "five or more participants."  We do not consider the government's alternative argument that, even if CD1 does not count as a member of the conspiracy, there are still five participants due to Ackies's references to "my peoples" in a phone call and to "my other people" on a different call.

## III.

Affirmed.

_____

States v. Howell, 527 F.3d 646 (7th Cir. 2008), is inapposite. There, the question, in part, was whether the "aggravating role" enhancement should be applied to a defendant who was a mere "dealer" and exercised essentially no control over a particular buyer who sometimes re-sold the drugs.  527 F.3d at 650.  (The enhancement ultimately applied in that case due to the defendant's management of a third person).

Ackies's citation to United States v. Fuller, 897 F.2d 1217 (1st Cir. 1990), similarly is inapposite.  In Fuller, this court stated that the "aggravating role" enhancement "does not apply to a defendant who merely organizes or supervises criminal activity that is executed without the aid of others."  Id. at 1220.  Ackies clearly had the aid of others.

Finally, his citation to United States v. Brown, 944 F.2d 1377 (7th Cir. 1991), does not help him, because Brown considered whether the defendant's "status as a distributor, standing alone" was sufficient for applying the enhancement.  Id. at 1381.  The government did not rely only on Ackies's status as a drug distributor in arguing for this sentencing enhancement.